VAN HAAFTEN *v.* VAN HAAFTEN.

MARRIAGE — ANNULMENT — INSANITY — EVIDENCE — SUFFICIENCY —
RELIGIOUS BELIEFS.

On a bill to annul a marriage on the ground of insanity of the
wife at the time of the marriage, it appeared that the parties
were aged, when married, that the wife was a religious enthusi-
ast, that they lived together for three years before separating,
and after the first separation cohabitation was resumed at the
husband's request. The bill was not filed until after she had
been adjudged insane and her guardian had sought to compel
him to support her. *Held,* that a case for annulment was not
shown.

Appeal from Kalamazoo; Adams, J. Submitted Jan-
uary 11, 1905. (Docket No. 26.) Decided March 28,
1905.

Bill by Ive Van Haaften against Antonia Van Haaften
and Walter Hoek, as guardian of defendant Van Haaf-
ten, to annul a marriage. From a decree for complain-
ant, defendants appeal. Reversed, and bill dismissed.

*Hollender & Notley* and *Dallas Boudeman,* for com-
plainant.

*Osborn & Mills* and *A. M. & C. H. Stearns,* for de-
fendants.

HOOKER, J. The parties to this cause were respectively
75 and 60 years old when married. They lived together
nearly three years, after which they separated without
apparent reason. This was followed by a resumption of
cohabitation at the solicitation of the complainant, and
some time later by another separation. The wife lived
with her son for a time, when she was adjudged insane,
and has been in the Kalamazoo asylum since. Her ex-
penses were paid from her estate, and her guardian after-

wards brought suit to recover them from the husband. Subsequently the husband brought this action to have the marriage declared null upon the ground that the woman was insane at the time of the marriage.  A decree for the complainant was rendered at circuit, and the case has been appealed.

The proofs show that the parties were married on August 27, 1894.  They separated within three years. About three years later, and on April 12, 1900, the woman was adjudged insane, and sent to the asylum.  On April 27, 1903, Walter Hoek was appointed her guardian.

We have endeavored to examine the testimony in the case critically.  Our impressions derived therefrom are that the woman was for some years a religious person, who perhaps took the teachings of her faith more literally than is usual; that she was much concerned about her spiritual welfare; and that on some occasions she obtruded these things upon others, more than is commonly done. Her husband testified to some instances of talking to herself, more frequently after she went to bed.  He was unable to understand her.  Sometimes during the day he noticed peculiar actions, and that she walked up and down the room four or five times, with her hands clasped, but saying nothing.  He never spoke to her about it, and did not know why she did these things.  He stated that on one occasion she said she saw something, something he did not like to see.  When asked what it was, he replied:

"I don't know nothing, because I stopped her.  She started, but I stopped her.  She said these, and she saw that.  Some angels, and sometimes Christ, and so on.

"*Q.* How frequently did you talk about ghosts with her, or spirits?

"*A.* Not very much.  I shut her up when she began to talk about it.  I told her to stop talking.

"*Q.* How often did that occur?

"*A.* Well, maybe two or three times.  That is all—to me.

"*Q.* How soon after you were married to her did that begin?

"*A.* Maybe four or five or six weeks.

"*Q.* Now, when you had this talk about the angels and Christ, did she say that she had seen them?

"*Mr. Stearns:* I object to that as leading.

"*A.* Yes, she saw them.

"*Q.* Just tell us what she said.

"*A.* I could not say much, because I stopped her right away as soon as she commenced. I didn't like to listen to that thing.

"*Q.* I want you to tell as near as you can—tell about what she has seen, and what she said to you she had seen, at those times.

"*A.* Just what I say. I could not say no other way. She came in to talk, and I stopped her right away, because I did not believe in such things.

"*Q.* How much would she say when she commenced?

"*A.* Oh, maybe a good deal. I don't know.

"*Q.* What was it she said?

"*A.* She was talking about the angels and Christ, and then I quieted her right away. I stopped her right away.

"*Q.* Did you leave her, and tell her to stop?

"*A.* At first I stopped her, and then I go out of the house and go in the barn.

"*Q.* And this occurred how frequently—how often?

"*A.* Oh, frequently—more—maybe three times; that is all. I got to make excuses, and go to the barn."

He never called her insane, or called a physician to consult regarding her condition.

It is unnecessary to quote the testimony of other witnesses, and it is sufficient to say that the evidence indicates that she was exceptionally religious, perhaps abnormally so; that she believed in the visitation of spirits—not, perhaps, of her own particular friends, but spirits generally; that she believed in a personal devil, and that he had personal designs regarding her, which were thwarted only through the intervention of Christ, to whom she looked for protection; that she communed with Christ, and saw spirits and angels.

The evidence indicates that she was a model housewife, and that the relation of the parties toward each other was satisfactory to the complainant up to the time that she finally left him. He gave no reason for the separa-

tion, apparently did not know why she left. He opposed her going upon the second occasion, and told her that if she did she must not come back. There is nothing to indicate that he thought her deranged during these years, though it is improbable that he was ignorant of her religious tendencies. The manifestations of religious opinion, zeal, and fervor are too various and common to justify an assumption of derangement lightly. It certainly would not do for courts of justice to set up their own views upon such subjects as a standard of what is natural, or in conformity to general opinion. Upon these subjects it would be difficult to determine what religious opinions could safely be called "insane delusions consisting in the belief of facts which no rational person would believe." Nevertheless, we do know that religious interest sometimes begets insanity, and it is plainly shown in this case that the defendant became insane, and there is abundant evidence that it was in a measure due to her religious belief, though there is no certainty that it is the principal cause. The fact of her ultimate derangement is the only thing that gives plausibility to the complainant's claim. If she had continued to this day to evince no further symptoms of insanity than those preceding the separation of these parties, we could not safely infer insanity. Insanity is not to be lightly inferred. Many cases protest against it.

In *Cole* v. *Cole*, 5 Sneed (Miss.), 59, it was said:

"Every consideration of policy and humanity admonishes us that a contract so essentially connected with the peace and happiness of individuals and families and the well-being of society should not be annulled on this or any other ground not clearly made out."

This view has support in *Powell* v. *Powell*, 27 Miss. 783, where it is said that "the law favors marriage, and, when once solemnized according to forms of law, will not declare its nullity upon anything less than clear and certain testimony."

Hayden, J., in *Slais* v. *Slais*, 9 Mo. App. 97, expresses the sentiment thus:

" A contract of marriage is not likely to be pronounced void, on the ground that one of the parties was insane, and incapable of contracting. The testimony by which such cases are often supported is open to suspicion, and nowhere ought the discernment of the chancellor to be more employed than in weighing witnesses who testify as to insanity."

This is pertinent language to the testimony before us.

In *Kern* v. *Kern*, 51 N. J. Eq. 582, the language from *Cole* v. *Cole*, supra, given above, is quoted more at length and with approval. The New Jersey court said, " A result so important * * * should not be reached except upon the most convincing proofs," etc.

When we consider the uncertainty of the conclusion that should be drawn from the facts stated, coupled with the failure of the complainant to discover insanity so long as he could induce the defendant to live with him, the coincidence of the attempt to compel him to support her, and his assertion of this claim, we are not able to say that the claim of insanity is proven, or that we would be justified in saying that she was ever insane previous to the marriage. It is true that she is said to be insane now, but when her reason was dethroned is not satisfactorily shown.

We have not found it necessary to discuss the questions arising in relation to our statute and the interpretation that it should receive, as, under any view presented by counsel, the complainant's case fails upon our understanding of the proofs.

The decree is reversed, and complainant's bill will be dismissed, with costs of both courts.

MOORE, C. J., and CARPENTER, MONTGOMERY, and OSTRANDER, JJ., concurred.