[No. 31031. Department One. January 23, 1950.]

*In the Matter of the Estate of* LAWRENCE J. GALLAGHER, *Deceased.*

JEWEL PERRET, *Administratrix, Appellant,* v. JEANNETTE CREMEANS, *Respondent.*[1]

[1]Reported in 213 P. (2d) 621.

 

*Wright, Booth & Beresford,* for appellant.

*Skeel, McKelvy, Henke, Evenson & Uhlmann (Frank L. Murphy,* of counsel), for respondent.

SCHWELLENBACH, J.—This is an appeal from an order setting aside the assets of decedent's estate to his widow in lieu of homestead.

Lawrence J. Gallagher died intestate November 26, 1944, leaving property in King county. His sister, Jewel Perret, was appointed and qualified as administratix of the estate. In her final report, Mrs. Perret showed the assets to be valued at $3,488.85. As his survivors and heirs, she listed herself, another sister, and two nieces. She also alleged that Jeannette Zian Cremeans claimed to be the widow of decedent, by virtue of a purported marriage with him; that such purported marriage was illegal because her brother did not have mental capacity to enter into the marriage, and Jeannette Cremeans did not have legal capacity because of a prior marriage which, at the time of the purported marriage to decedent, had not been dissolved.

Jeannette Gallagher filed objections to the final report, claiming to be the lawful surviving wife of decedent by virtue of her marriage to him on October 26, 1925; and that, if such marriage were found to be invalid, then by virtue of a common-law marriage under the laws of the state of Michigan.

The trial court found Jeannette Gallagher to be decedent's widow, as the result of a common-law marriage in Michigan, and awarded the property to her.

On July 5, 1921, Garrett Oriol Cremeans and Jeannette LaVerne were married in San Francisco, California. He was a marine. They lived together seventy-two hours and then separated. From that time on neither saw nor heard

from the other. She testified that at the time of the separation, he promised to get a divorce. By deposition he denied making such a promise.

At any rate, she moved to Seattle in September, 1924, and met Gallagher the following year. They were married in King county on October 26, 1925. They remained in Seattle for a few weeks and then went to Milwaukee, where they met his family. From there they went to Chicago, where he was employed as a ship's officer on the Great Lakes. The latter part of 1926, they moved to Detroit, Michigan, where they lived until January, 1932, when they went to Sacramento, California. Mr. Gallagher was drowned at sea November 26, 1944, while serving as a captain in the merchant marine during World War II.

From the time of the marriage on October 26, 1925, until his death, they were recognized and lived together as husband and wife. They were so accepted by his parents, his uncle and his sister. Their landlord, their friends and acquaintances and the Veterans Administration, recognized them as such. Because of his health, which will be discussed later in this opinion, he worked only three or four months out of a year, and it was necessary for Mrs. Gallagher to work throughout their married life, in order to keep up the household expenses. They never lived together in a meretricious relationship, but always in good faith as husband and wife.

On January 14, 1929, Cremeans, by virtue of a summons by publication, obtained a divorce in Canton, Ohio, from Jeannette. She knew nothing of these proceedings, knowledge of which was ascertained by Mrs. Perret in connection with the present controversy.

■ Citation of authority is not necessary in order to hold that the Washington ceremonial marriage of October 26, 1925, was invalid. Jeannette then had a husband living, from whom she had not been divorced.

■ We are therefore confronted with the problem of whether or not there was a common-law marriage in Michigan. Although this state does not recognize common-law

marriages, if originally contracted and consummated in this state, we have sustained the validity of such marriages which have been contracted and consummated in other states where they were lawful under the *lex loci contractus. Willey v. Willey,* 22 Wash. 115, 60 Pac. 145, 79 Am. St. 923.

■ A common-law marriage is a marriage without formal solemnization. However, there must be an actual and mutual agreement to enter into a matrimonial relation, between parties capable in law of making such a contract, consummated by their assumption openly of marital duties and obligations. Merely living together, even as husband and wife, is not sufficient. Any impediment which would prevent a statutory marriage or one by religious ceremony bars a common-law marriage. See 55 C. J. S. 818, Marriage, § 6.

Such marriages are recognized in the state of Michigan. *Walsh v. Ferguson,* 249 Mich. 539, 229 N. W. 424; *Ryan v. Randall,* 252 Mich. 501, 233 N. W. 394; *Hess v. Pettigrew,* 261 Mich. 618, 247 N. W. 90. The facts in the latter case are quite similar to the one at bar. There, the defendant was ceremonially married to one Howe in Scotland. After a couple of years, they separated and the defendant moved to Michigan, where she entered into a marriage ceremony with the plaintiff in 1919. In 1931, the plaintiff commenced a suit for annulment, contending that the marriage entered into between the parties was void because the defendant then had a husband living, from whom she had not been divorced. Howe had obtained a divorce from defendant in Scotland in 1922 on substituted service. Neither the plaintiff nor defendant knew of the divorce until the day the annulment suit was filed. No ceremony or agreement of marriage in words occurred after the Howe divorce. The Michigan court held that after the divorce the parties were competent to and did contract a common-law marriage, saying:

"While there is some difference of reasoning and ruling, the decided weight of authority is that where parties engage upon a contract of marriage, which is void because one

has a living lawful spouse, which is unknown to one or both, uninterrupted cohabitation and reputation after removal of the impediment will produce a valid common-law marriage, although the fact of the impediment or of its removal may not have been known to either. The principal reasons upon which the rule rests are that the initial relationship was intended to be matrimonial, not illicit, and consent to present marriage evidenced by the ceremony continues from day to day and becomes effective as a present taking in marriage on removal of the impediment. . . .

"After the Howe divorce both parties were competent to contract marriage. In all respects each considered and treated the other as a lawful spouse, so held out their relationship to the world and they were so accepted. The only questionable element of the relationship is whether they took each presently as husband and wife. The reasoning that the consent and taking manifested by the former ceremony and cohabitation thereunder was a continuing state, renewed constantly and operated as a present taking when the impediment was removed, fits snugly into the law of marriage and accords with the public policy relating to it."

So, in the case at bar, on January 14, 1929, when Cremeans obtained the divorce, the impediment to the marriage between Lawrence and Jeannette Gallagher was removed. The consent and taking manifested by the former ceremony, coupled with continued cohabitation thereunder, operated as a present taking, and they thereupon entered into a common-law marriage, unless Lawrence Gallagher was not then mentally competent to enter into such a contract. The cases of *Blodgett v. Blodgett,* 109 Wash. 597, 187 Pac. 340, and *State ex rel. Smith v. Superior Court,* 23 Wn. (2d) 357, 161 P. (2d) 188, are clearly distinguishable on their facts.

With reference to Gallagher's mental competency to enter into a common-law marriage, the record shows that prior to his discharge as a lieutenant in the United States Navy on September 23, 1921, he received an injury in Japan which affected him mentally. The family history showed no physical or mental weakness in any of its members. He was interned in the Western State Hospital at Steilacoom

by the Veterans Administration, and later transferred to American Lake, where he remained until June, 1925, when he was released on order of the Veterans Administration. He was not committed under court order and, after his release, he was never in any mental institution or hospital. However, on March 8, 1924, his sister, Jewel Perret, was appointed in King county as the guardian of his person and estate. Although she never was discharged as guardian, she did, in 1929, turn over to him a diamond ring valued at $1,000 and an Adjusted Service Certificate in the amount of $1,577, for which he receipted. Mrs. Gallagher, at the time of the marriage ceremony in 1925, knew nothing of the guardianship or of his having been in American Lake.

On April 12, 1927, Gallagher was examined by a physician of the Veterans Administration in Chicago. Although his attitude, manners, and evasiveness suggested psychopathic conduct, he was found to be competent, with no neuropsychiatric condition.

He was again examined in Detroit in March, 1929. At that time he appeared to be agitated, irritable, and suspicious. He showed a definite social and industrial inadaptability and inadjustability. However, his mental activity was in no way abnormal. No hospitalization was advised and he was found to be competent. His neuropsychiatric condition was diagnosed as dementia praecox, paranoid type.

The next examination was by the same physician in April, 1930. We quote from the report of that examination:

"The psychiatric examination today reveals nothing new. The patient's behavior in the office is in no way abnormal. His account is mostly in answer to questions with a rather definite lack of spontaneity. When not questioned he looks out into space and shows a good deal of preabsorption and some distractability of attention. His mental trend is very pronounced. He still feels that people persecute him, watch him on the street and pry into his business. He is very suspicious regarding the Veterans Bureau and the physicians. He is not certain about the Veterans Bureau records, thinks that there may be something in them to do him harm. He feels that his entire difficulty has arisen because of the

Masonic order, who made him take a certain oath and that since taking that oath poison had been placed in his food.

"Opinion: We feel that the former diagnosis should be continued and that the patient be looked upon as a psychotic individual, poorly adjusted from a social and industrial point of view, but not requiring immediate supervision.

"Diagnosis: Dementia praecox, paranoid type—with poor social and industrial adjustment—not requiring immediate supervision."

As a result of the latter examination, the Central Board of Appeals in Chicago, on July 1, 1930, rated him as incompetent, temporary partial disability of seventy per cent, dementia praecox not requiring supervision, paranoid type. For purposes of paying a pension he was rated incompetent back to March 8, 1929.

We are unable to find a Michigan case which has determined the mental competence necessary to contract marriage. The general rule is that the quantum of mental capacity required for the contract of marriage is the capacity of the person to understand the special nature of the contract and duties and responsibilities which it entails. 55 C. J. S. 825, Marriage, § 12. Quite an exhaustive consideration of this subject is found in *Elfont v. Elfont*, 161 Md. 458, 157 Atl. 741, a case closely paralleling the one at bar. On July 17, 1919, while in the Mayview Insane Asylum at Pittsburgh, Pennsylvania, Robert Elfont filed a claim with the Veterans Bureau, alleging a mental disease. Thereafter, he was in a number of like institutions. In 1924 he was examined by three doctors of the Bureau, who recommended a total disability rating for dementia praecox. This rating was approved by the Board of Appeals, which gave a permanent total rating for "dementia praecox, paranoid type, incident to service, incompetent on and after November 21, 1921." On August 4, 1922, by order of the circuit court, his father was appointed guardian of his estate.

Robert married a young lady August 20, 1926, after a year's courtship, during which they visited and corresponded with each other. It was some time after their marriage when she first learned of the guardianship and of

his having been confined in various institutions. In December, 1930, the father, as Robert's guardian, instituted annulment proceedings. Two physicians connected with the Veterans Bureau testified that, in their opinion, he did not have sufficient mentality to enter into or to understand the nature or responsibilities of the marriage contract. Dr. Warner testified:

" 'He was quite abnormal and extreme in conduct and thought. He was seclusive and suspicious, nervous and irritable, restless; he suffered with insomnia and generally nervous. He was suspicious, he suffered with depression and ideas of self-reference, and he had some persecutory ideas at that time and the conclusion was that he was suffering with a mental aberration called *dementia praecox*. That was the diagnosis established at that time.' "

On the other hand, both Robert and his wife testified that he was mentally competent. Prior and subsequent to their marriage, he was employed as the manager of one of his father's shoe stores. Letters introduced displayed a rather keen business ability.

The trial court granted the annulment. This was reversed by the appellate court, which held that the evidence was not sufficient to show that, at the time of the marriage, Robert did not understand the nature of the marriage contract or the legal consequences deducible therefrom. The court said:

"The well-settled rule or principle of law, both in this state and elsewhere, by which we are to be controlled, is that, to render a marriage invalid because of insanity on the part of one of the parties to the contract, it must be shown clearly and convincingly that such party was unable to understand the nature of the contract of marriage and to appreciate the legal consequences naturally deducible therefrom. Every variation from a normal mental condition is not in itself enough to avoid the marriage contract. The mental defect or derangement must be one having a direct bearing upon such contract. If the party entering the marriage relation has sufficient capacity to understand the nature of the contract and the duties and responsibilities which it creates, the marriage will be valid. Mere weakness or imbecility of mind is not sufficient, nor eccentricity or

partial *dementia,* but it must be such a general mental derangement as prevents the party from comprehending the nature of the contract of marriage and from giving to it his free and intelligent consent."

See, also, *Van Haaften v. Van Haaften,* 139 Mich. 479, 102 N. W. 989.

In the case at bar, the Veterans Administration, as a result of the April, 1930 examination, rated Gallagher as incompetent back to March 8, 1929, for the purpose of paying a pension. The common-law marriage was entered into January 14, 1929. Without further discussing the testimony we hold that, at that time, he had the capacity to understand the special nature of the marriage contract, and the duties and responsibilities which it entailed.

Appellant further contends that the common-law marriage was void because of failure to obtain the required physicians' certificates, in accordance with the terms of 3 Compiled Laws of Michigan, 1929, § 12695 (Michigan Statutes Annotated, § 25.6), which provides in part:

"No insane person, idiot, or person who has been afflicted with syphilis or gonorrhea and has not been cured of the same, shall be capable of contracting marriage. . . . No person who has been confined in any public institution or asylum as an epileptic, feeble-minded, imbecile or insane patient, or who has been adjudged insane, feeble-minded, an epileptic or an imbecile by a court of competent jurisdiction shall be capable of contracting marriage without, before the issuance by the county clerk of the license to marry, filing in the office of the said county clerk a verified certificate from two [2] regularly licensed physicians of this state that such person has been completely cured of such insanity, epilepsy, imbecility, or feeble-mindedness and that there is no probability that such person will transmit any of such defects or disabilities to the issue of such marriage."

Appellant relies upon *Stratos v. Stratos,* 317 Mich. 113, 26 N. W. (2d) 729, wherein the court said:

"In 1928, when plaintiff went to live with defendant, she was still receiving medical treatment for a venereal disease and, therefore, was incapable of contracting a marriage. 3 Comp. Laws 1929, § 12695 (Stat. Ann. § 25.6)."

However, immediately following the above statement, the court went on to say:

"Several years elapsed during which plaintiff successfully responded to treatment and was cured. Throughout the period of plaintiff's treatment and for a considerable time thereafter, the parties lived as husband and wife. The impediment to marriage having been removed, the continued cohabitation of the parties under the circumstances hereinbefore set forth resulted in a valid common-law marriage."

In *Buechler v. Simon,* 104 N. J. Eq. 572, 146 Atl. 420, and *Storf v. Papalia,* 24 N. J. Misc. 145, 46 A. (2d) 907, the New Jersey court held a similar statute to be a police regulation which did not affect the legality of forbidden marriages; that the marriages were not void but voidable under a proper showing by the aggrieved parties.

Michigan has another statute (Stat. Ann. § 25.81) which provides:

"All marriages which are prohibited by law on account of consanguinity or affinity between the parties, or on account of either of them having a former wife or husband then living, and all marriages solemnized when either of the parties was insane or an idiot, shall, if solemnized within this state, be absolutely void, without any decree of divorce or other legal process."

We are satisfied from the above statute, and from the interpretation given to Stat. Ann., § 25.6 by the Michigan court, that, as to the question of mental capacity, only marriages solemnized when either of the parties was insane or an idiot are void. We have already determined from the record that at the time the common-law marriage was entered into, Lawrence J. Gallagher was neither insane nor an idiot. The marriage was not void.

There having been a valid common-law marriage in Michigan which continued to exist until Gallagher's death, the trial court properly set aside his estate as an award in lieu of homestead to Jeannette Gallagher, his widow. The judgment is affirmed.

SIMPSON, C. J., BEALS, GRADY, and DONWORTH, JJ., concur.