No. 14605

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

IN THE MATTER OF THE ESTATE

OF

RALPH I. SCHANBACHER,

Deceased.

---

Appeal from:  District Court of the Thirteenth Judicial District,
Honorable Nat Allen, Judge presiding.

Counsel of Record:

For Appellant:

Robert L. Stephens, Jr., Billings, Montana

For Respondent:

Berger, Anderson, Sinclair & Murphy, Billings, Montana
Elmer Dolve, Billings, Montana

---

Submitted on briefs: March 29, 1979

Decided: **MAY 3 0 1979**

Filed: **MAY 3 0 1979**

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This appeal is from a summary judgment of the District Court, Thirteenth Judicial District, County of Yellowstone, the Honorable Nat Allen presiding. The summary judgment was dated September 19, 1978, and was granted on a motion on behalf of Edith Ellis, the personal representative herein, in its entirety and dismissing the petitions of Elsie Lester, Margaret Joan Lester, and Roberta Louise Lester with prejudice. The court also denied a motion for summary judgment of Elsie Lester, Margaret Joan Lester, and Roberta Louise Lester.

In this opinion, Ralph I. Schanbacher, the deceased herein, will be referred to as "Ralph" and Elsie Jane Lester, one of the appellants, will be referred to as "Elsie". Ralph I. Schanbacher, also known as Ralph I. Lester, married Norvall Fern Johnson on November 8, 1916, in Newton, Kansas. There were four children born of this marriage including Edith Ellis, the personal representative herein. This marriage continued until Fern's death in Billings, Montana, in September 1973.

Throughout his life Ralph was a cattle buyer. He also owned and operated several ranch properties and a feedlot at Lewistown, Montana. In this business he was required to spend considerable time on the road and away from his family. This was so not only during his marriage to Fern, but later, in his living arrangement with Elsie. Elsie was the widow of Norman Lester, and was introduced to Ralph by Norman Lester, who introduced Ralph as his cousin Ralph Lester. Elsie met Ralph in 1947 when she was working in a coffee shop in Amarillo, Texas, but it was not until after the

death of her husband Norman that they began to date, sometime in the year 1952.

Ralph told Elsie that he had been married but that his wife was deceased. After going together for a period of time, they discussed marriage and, according to Elsie, they went to Clovis, New Mexico, where on November 14, 1952, a wedding ceremony was performed in the home of a congregational minister. A year or so later, Elsie found out that Ralph did have another wife and that his name was Schanbacher. When confronted with this information, Ralph told Elsie that he did not live with Fern, did not care for her, and that he merely used the name of Schanbacher as a business name. In her deposition, Elsie stated that when she got this information, she was worried about a possible bigamy charge against Ralph, that they loved each other, and that because he assured her that he did not care for his first wife and was not living with her, she did not take any legal action.

At the beginning of her relationship with Ralph, Elsie had three children, two boys by her first marriage which had ended in a divorce, and a girl by her marriage to Norman Lester, who was killed in an automobile accident. Throughout the period that she lived with Ralph, he supported these children and claimed them as his own. Ralph and Elsie also had two children, Margaret Joan Lester born June 7, 1956, in Amarillo, Texas, and Roberta Louise Lester born September 14, 1960, in Amarillo. On both birth certificates the name Ralph I. Lester is given as the father.

Ralph and Elsie lived together in Amarillo, Texas, where they purchased a home and lived until 1957; they lived in Austin, Texas, briefly; and they lived in Billings in a

motel for a short period of time and later rented a home, although Ralph continued to travel extensively in his cattle buying ventures.

After 1957 the couple lived in Amarillo, Texas; Denver, Colorado; Miles City, Montana; Great Falls, Montana; Missoula, Montana; Casper, Wyoming; and at one time, they lived for a period of two years in Lewistown, Montana, where they purchased a home. In addition, they owned a home in Florence, Montana, and rented property in Butte, Bozeman, and Cheyenne, Wyoming. All of this property was purchased or rented under the name of Ralph I. Lester. In 1972 Ralph suffered a stroke in Billings, and Elsie came to Billings and stayed with him at the Ponderosa Inn. She returned for a short period of time to Cheyenne, where they had been living, and then returned to Billings at which time they rented a mobile home. During this time Ralph's first wife died, which was in September 1973.

In March 1974 Ralph and Elsie moved to 3304 Winchell Lane in Billings, where they rented an apartment and lived together as husband and wife until his death. While living in this apartment under the name of Lester, Ralph had an unlisted telephone number installed under the name Schanbacher for business purposes. Affidavits were submitted by neighbors and friends of Ralph and Elsie to the effect that they socialized with Ralph and Elsie, had dinners together, visited each other's families, and that these friends and neighbors recognized Elsie and Ralph as husband and wife and that they held themselves out to be the same.

During the 24 years that Ralph and Elsie lived together, according to Elsie, he provided for her very well and also for her children. While they did have financial

hardships, he had never wanted her to work. While living in Billings, Ralph referred to his first wife, Fern, as "Aunt Fern", and his daughter Joan knew her as Aunt Fern. After Fern's death, Ralph wanted the family to move into his home on Delphinium Avenue, but Elsie said she was reluctant to move there because the home contained Fern's furniture and possessions. Also, the house was used by the children of his other marriage as a stopover place while visiting in Billings. However, Ralph, Elsie and Joan did care for this second home and went there at least once a week to clean it and care for the yard.

From 1952 until his death, Ralph and Elsie Lester held themselves out as husband and wife. Various expenses which were incurred during the course of this relationship were paid for and receipted in the name of Ralph Lester. During Ralph's frequent buying trips he sent money to Elsie and the children by Western Union as Ralph Lester. Friends and neighbors knew Ralph and Elsie as husband and wife. They received Christmas cards, wedding invitations, and other mail addressed to Mr. and Mrs. Ralph Lester. The public school system recognized the marriage of Ralph and Elsie in connection with the education of their children, and the family medical records indicate the marriage status of Ralph and Elsie as do the birth certificates of the two children. Ralph and Elsie Lester were listed in the 1975 and 1976 Billings City Directory as husband and wife.

It was not until Ralph's last illness that Elsie met any of his children of his marriage to Fern. An affidavit submitted for the court's consideration by a nurse's aid stated that because Elsie had been in such constant atten- dance of Ralph during his last illness, she asked Elsie, in

the presence of Ralph's children by Fern, what relationship she was. Elsie identified herself as a "friend" and not as the wife of Ralph. Elsie answers that she did not want to embarrass the children of the first marriage by revealing the relationship she had had with their father. At the time of Ralph's death, his oldest daughter Edith took charge of the funeral, and he was buried beside his first wife Fern.

Ralph filed a joint income tax under the name of Schanbacher and giving his wife's name as Fern until 1972. Thereafter, he filed as a "single man." In 1975 Ralph made a Will in which he failed to mention that he had a wife, the appellant Elsie, and that he had two children by her. Following Ralph's death on November 11, 1976, this Will was submitted to probate. The Will was submitted by Edith Ellis, one of his daughters, who filed an application for an informal probate of the Will and to be appointed personal representative therein. On November 15, an order of informal probate of the Will and the appointment of the personal representative was signed by the clerk of the District Court and letters were issued to Edith Ellis as personal representative.

On February 2, 1977, the demand for bond and the demand for notice were filed by Elsie as a surviving wife of Ralph and the mother of the two surviving children, Margaret Joan Lester and Roberta Louise Lester. On the following day, a petition for supervised administration and a notice of claim and petition by pretermitted children were filed. An amended verified petition for supervised administration, and the amended notice of claim and petition by pretermitted children were served in this matter on February 10, 1977.

Thereafter, Elsie filed on May 4, 1977, a petition for family allowance, petition for exempt property, petition for a homestead allowance, and a widow's elective share therein. On August 18, 1977, the deposition of Elsie was taken in this matter. On November 3, 1977, the personal representative filed a memorandum and motion for summary judgment. Hearing on the motion was set for November 28, 1977, but the hearing was not held. The matter was finally heard in September 1978, at which time findings of fact and conclusions of law were made by the District Court. On October 13, 1978, a brief hearing was held in the chambers on petitioner's motion to amend the findings of fact and conclusions of law, which was denied by the District Court on October 13, 1978.

We need not set forth the issues as stated by counsel on appeal, but set them forth below as we see controlling in this case. Here there are genuine issues of material fact precluding summary judgment on the two following issues:

1. Whether there was a common law marriage between Ralph and Elsie after the death of Fern?

2. Are the two children of the relationship of Ralph and Elsie to be considered issue of the marriage of the decedent?

While the 1952 marriage between these parties was prohibited by virtue of Ralph's preexisting marriage to Fern, upon her death in September 1973, a fact question of whether this impediment to the marriage was removed is raised by our statute. See Stevens v. Woodmen of the World (1937), 105 Mont. 121, 71 P.2d 898, 905. From documents submitted by Elsie, there was evidence that, after the death of Fern, Ralph and Elsie lived together as man and wife,

first in a mobile home in the Lockwood addition, and then in an apartment at 3304 Winchell Lane. They lived at this residence until Ralph's death on November 11, 1976. Following Fern's death, the children of the second union and Elsie and Ralph cared for the residence that had been purchased by Ralph for his wife Fern, looking after the lawn, etc., and maintaining the property until Ralph's death. From the record before the court, these facts were not contested by the personal representative. Therefore, a question arises under section 48-310(2), R.C.M. 1947, now section 40-1-401(2) MCA, as to whether or not Elsie and Ralph were lawfully married.

In 1975, the Montana Legislature enacted the national draft of the Uniform Marriage and Divorce Act, which became sections 48-301 through 48-341, R.C.M. 1947, now sections 40-1-101 through 40-4-220 MCA. Section 48-302, R.C.M. 1947, now sections 40-1-101 and 40-4-101 MCA, set forth the purpose of the Act as follows:

> "This act shall be liberally construed and applied to promote its underlying purposes, which are to:
>
> "(1) provide adequate procedures for the solemnization and registration of marriage;
>
> "(2) strengthen and preserve the integrity of marriage and safeguard family relationships;
>
> "(3) promote the amicable settlement of disputes that have arisen between parties to a marriage;
>
> "(4) mitigate the potential harm to the spouses and their children caused by the process of legal dissolution of marriage;
>
> "(5) make reasonable provision for spouse and minor children during and after litigation; and
>
> "(6) make the law of legal dissolution of marriage effective for dealing with the realitites of matrimonial experience by making irretrievable breakdown of the marriage relationship the sole basis for its dissolution."

-8-

Section 48-310(2), R.C.M. 1947, now section 40-1-401(2) MCA, provides:

> "(2) Parties to a marriage prohibited under this section who cohabit after removal of the impediment are lawfully married as of the date of the removal of the impediment."

The above statutes embody a progressive policy long followed by such courts as the Circuit Court of Appeals of the District Columbia which held in Matthews v. Britton (D.C. Cir. 1962), 303 F.2d 408, 409:

> "Nevertheless, as long as the impediment of Earnestine's lawful marriage to Johnson existed, she and Harry Matthews could not lawfully be or become husband and wife. However, it is settled that if parties agree to be husband and wife in ignorance of an impediment to lawful matrimony, then the removal of that impediment results in a common-law marriage between the parties if they have continued to cohabit and live together as husband and wife . . . the same result obtains even if parties have knowledge of the impediment at the time they agreed to be married. It is not to be expected that parties once having agreed to be married will deem it necessary to agree to do so again when an earlier marriage is terminated or some other ban to union is eliminated."

See, the Commission Comment to Section 207(b), Uniform Marriage and Divorce Act, 9 U.L.A. 470.

In addition, had not section 48-310(2) been enacted, the fact remains that Elsie could, under the fact situation presented to the Court here, still have been a surviving widow of Ralph by virtue of a valid common law marriage after the death of Fern in 1973. Montana has long recognized the validity of common law marriages and this is carried forward in the Uniform Marriage and Divorce Act in section 48-314, R.C.M. 1947, now section 40-1-403 MCA.

The second issue of whether the children of the union of these two people are issue of the decedent is a fact issue which cannot be decided by summary judgment. When the Uniform Marriage and Divorce Act was adopted by our legisla-

ture, several sections were devoted to the protection of the children of a marriage. These relate to strengthening and preserving the integrity of marriage and safeguarding family relationships; to the promotion of settlement of disputes; to mitigation of harm to spouses and their children caused by process of legal dissolution of marriage; and to reasonable provisions for a spouse and minor children after litigation. These items should be considered in the fact situation we have here.

The question to be decided on a motion for summary judgment is whether there is a genuine issue of material fact and not how that issue should be determined. Baylor v. Jacobson (1976), 170 Mont. 234, 552 P.2d 55; Fulton v. Clark (1975), 167 Mont. 399, 538 P.2d 1371. We have further noted that summary judgment is not a proper tool for resolving disputed issues of fact and is accordingly improper whenever a material factual matter is in dispute. Engebretson v. Putnam (1977), _____ Mont. _____, 571 P.2d 368, 34 St.Rep. 1241; Duncan v. Rockwell Mfg. Co. (1977), _____ Mont. _____, 567 P.2d 936, 34 St.Rep. 821; Bahm v. Dormanen (1975), 168 Mont. 408, 543 P.2d 379. In Engebretson, this Court noted:

> "The purpose of the summary judgment procedure is to encourage judicial economy through the eilimination of unnecessary trial, delay and expense. [Citations omitted.] Summary judgment is not a substitute for trial, however, and is inappropriate when genuine issues of material fact remain to be litigated . . ." 571 P.2d at 370.

For the reasons above set forth, the summary judgment of the District Court is reversed. The matter is remanded for trial on the merits.

_____
Justice

-10-

We concur:

_____
Chief Justice

_____

_____

_____
Justices

-11-