No. 83-385

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

---

IN THE MATTER OF THE ESTATE
OF MICHAEL W. MURNION, Deceased.

---

APPEAL FROM: District Court of the Sixteenth Judicial District,
In and for the County of Rosebud,
The Honorable Alfred B. Coate, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Regnier, Lewis & Boland; Tom L. Lewis argued,
Great Falls, Montana
*Darlington, John & Robinson, Missoula, Montana*

For Respondent:

Sandall, Cavan & Smith; Robert C. Smith and John J.
Cavan argued, Billings, Montana
~~Darlington, Lohn & Robinson, Missoula, Montana~~
Crowley, Haughey, Hanson, Toole & Dietrich,
Billings, Montana

---

Submitted: March 13, 1984

Decided: August 28, 1984

Filed: AUG 28 1984

*Ethel M. Harrison*

---

Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Sherry Lynn Hart, as guardian of Katrina P. Murnion, a minor, appeals from a judgment and order of intestacy and determination of heirs entered by the District Court, Sixteenth Judicial District, Rosebud County, in the probate proceedings of the estate of Michael W. Murnion, deceased, to the effect that the decedent was survived by Pauline Jean Imel, his wife at the time of his death, and by Katrina P. Murnion, his daughter by a prior marriage.

The issue, sine qua non, which pervades this case is whether Pauline Jean Imel was the common-law wife of the decedent, Michael W. Murnion at the time of his death. The District Court determined that she was his surviving wife. We affirm the judgment of the District Court.

Michael W. Murnion died as a result of a fall from a scaffolding apparatus upon which he was working in the course of construction of unit no. 4 at Colstrip, Montana. As explained by respondent in her brief, his heirs are entitled to receive Workers' Compensation benefits in the amount of approximately $240 per week which would be split equally between the deceased's daughter, Katrina, and his surviving wife, Pauline, should she be found to be his spouse. If not, Katrina is entitled to the full amount of Workers' Compensation benefits until age 25, if she attends college. A surviving wife is entitled to Workers' Compensation benefits until death or remarriage.

As a surviving spouse, Pauline would be entitled to share equally in the distribution of Michael's estate which includes the proceeds of the survival portion of a civil

- 2 -

action pending. The civil action is one for survival and wrongful death, brought against Shurtleff and Andrews, Inc., a Utah corporation, and Bechtel Power Corporation, Montana Power Company, Puget Sound Power and Light Company, Portland General Electric Company, Pacific Power and Light Company, and Washington Power Company. These defendants in the civil action did not appear in the estate proceedings.

The proceeds of the civil action for survival and wrongful death may be substantial. Katrina and Pauline, if she is the surviving spouse, have independent causes of action for wrongful death, and both will be entitled to recover on their claims from the proceeds of the third party suit in accordance with a court apportionment. If, however, Katrina is the sole heir, she would be the sole beneficiary of the estate, and of the third party action for wrongful death.

In addition, there are life insurance benefits payable through the Boilermaker's Union, of which Michael was a member; $1,089.63 of those benefits are payable to the estate, and $46,000 is payable to his surviving spouse, and if none, to his child, Katrina.

In attacking the judgment of the District Court, the guardian of Katrina raises these issues:

1. The District Court under choice of law principles, improperly applied Montana substantive law to an alleged common-law marriage by oral agreement which was illegal in the State of Washington.

2. The District Court's findings of fact and conclusions of law which determine that Pauline was a common-law wife of the decedent are not supported by

- 3 -

substantial credible evidence, are clearly erroneous, and are contrary to law.

3. The District Court's alternative conclusion of law that even if Pauline was not a common-law wife, she is entitled to the rights of a putative spouse under section 40-1-404, MCA, is clearly erroneous in this case.

In resolving these issues, we look first to the findings of fact to determine if under Rule 52(a), the fact findings are clearly erroneous, for if so, the conclusions which the District Court drew from such findings must clearly fall. In equitable causes, if the issues are close, a degree of deference is accorded the findings of the trial court since it is in a better position to make decisions of fact; and the duty of the Supreme Court in reviewing an action of an equitable nature is to proceed under section 3-2-204(5), MCA, and to review independently all questions of fact as well as questions of law; which still allows us to uphold the District Court on questions of fact unless there is a decided preponderance of the evidence against its findings. Rase v. Castle Mountain Ranch, Inc. (Mont. 1981), 631 P.2d 680, 38 St.Rep. 992.

The District Court, in making its findings of fact, outlined the essential portions of the evidence upon which it relied, and gave reasons for distinguishing the items of fact relied upon by the guardian to dispute the common-law marriage. Rather than attempting to paraphrase the findings of the District Court, we find it simpler here, for the benefit of the reader, to set them forth in full as an appendix to this proposed opinion.

The guardian's attack against the propriety of the findings of fact is based on (1) inconsistent items of fact,

- 4 -

(2) the presumption that cohabitation illicit in its inception is presumed to be illicit throughout, and (3) the argument that the facts do not indicate that the parties contemplated a present assumption of marriage, but rather an intention to marry in the future.

The guardian insists that the following items of fact refute an existing common-law marriage between Michael and Pauline at the time of his death:

She utilized the name Pauline G. Imel on her October 21, 1981, application for employment; she did not identify on that application the name of Pauline Murnion, although she identified other names that she had used; she transferred bank accounts to Colstrip in the name of Pauline G. Imel; Michael listed his marital status as "single" on his employment application; they purchased a trailer as tenants-in-common using their own names; they purchased an apartment house in Billings, also using their own names as tenants-in-common; and similar documentary evidence.

Those items of fact, standing alone, would negate the assumption of a common-law marriage between the parties. Each item, however, was explained in the testimony, and the District Court accepted the explanation as valid. The issue of marriage really depended on the credibility of Pauline G. Imel. The District Court, having an opportunity to observe her and her demeanor on the stand, accepted the explanations. Moreover, the close members of Michael's family, his father and mother, and his brother, all supported Pauline in her contention that she was married to Michael. In our review of the facts, giving deference as we do to the trial court because it sees and hears the witnesses, we find that substantial credible evidence supports the District Court in

- 5 -

its findings, and they are not clearly erroneous. The evidence here is not weak but strong that the parties held themselves out as husband and wife during their period of residence in Montana. On appeal, we review evidence in the light most favorable to the prevailing party, and the credibility of witnesses and the weight accorded their testimony we leave to the District Court's determination in nonjury trials. Farmers State Bank v. Mobile Homes, Unlimited (1979), 181 Mont. 342, 593 P.2d 734.

The second consideration relating to the findings of fact is the guardian's argument that when a relationship is illicit in its inception between a man and a woman, the illicit relationship is presumed to have continued throughout the period of cohabitation. That is a proper statement of the law, and the burden rests upon the party asserting a valid marriage, in this case Pauline, to show that the relationship changed to a lawful relation by a marriage. Stevens v. Woodmen of the World (1937), 105 Mont. 121, 71 P.2d 898. The effect of a presumption, of course, is to place the burden on the other party to overcome the presumption. We determine that Pauline has met that burden by showing that their original meretricious relationship changed into a lawful one with their agreement to marry.

It is to be remembered, however, that there is a counter presumption, though disputable, that a man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage. Section 26-1-602(30), MCA. This Court in Welch v. All Persons (1926), 78 Mont. 370, 384, 254 P. 179, 182, stated that the presumption in favor of matrimony is one of the strongest known to the law and that every intendment of the law is in favor of matrimony, which

presumes morality and not immorality, marriage and not concubinage, legitimacy and not bastardy. Estate of Swanson (1972), 160 Mont. 271, 502 P.2d. 33.

The third attack on the findings is that the parties contemplated doing something further to formalize the marriage and until that was done, no marriage had occurred. Again the District Court explained in its findings that although the parties intended to do something further to formalize their marriage, to please Michael's parents, and to accommodate society, this intention to formalize did not conflict with the agreement they had made to become husband and wife. We agree with the District Court in this conclusion.

We turn now to a further issue raised by the guardian against the order of the District Court, the guardian's claim that under Washington law, which does not recognize common-law marriage, the alleged marriage between Michael and Pauline was invalid, and that Washington law should apply in this case.

The guardian's choice of law argument comes in two main thrusts, (1) that if Washington law applies, a common-law marriage is invalid and (2) that if Montana substantive law applies, the common-law marriage must take place immediately, come instantly into being, or it does not come into being at all.

Under the facts found by the District Court, Michael and Pauline were residents and domiciliaries of Washington at the time of the alleged agreement to marry. Both were employed in Washington, and both had all of their property in Washington at the time. They had each resided in Washington for a lengthy period prior to the agreement; their entire

relationship had commenced and continued in Washington until the date of the purported agreement and even thereafter for a period of at least one month.

The State of Washington does not recognize common-law marriages. In Re Gallagher's Estate (Wash. 1950), 213 P.2d 621; Willey v. Willey (Wash. 1900), 60 P. 145.

Both parties cite us to the Washington case of Gallagher, supra. In that case, the parties entered into a ceremonial marriage in 1925, but the marriage was invalid because the wife then had a living husband from whom she had not been divorced. The couple moved to Michigan, and then to other states, and lived together as husband and wife until 1945, when he died. The husband left property in Washington, which became the subject of a dispute with his blood relatives, who claimed that the ceremonial marriage to the wife was invalid, and that a common-law marriage is not recognized in Washington. We interpret the decision in Gallagher to mean that in Washington, although the state does not recognize common-law marriages originally contracted and consummated in the state, the validity of such a marriage will be sustained if it had been contracted and consummated in another state where it is lawful. Common-law marriages were recognized in the State of Michigan. In the Gallagher case, the former husband obtained a divorce without the knowledge of his former wife, then living with Gallagher. In upholding the validity of the common-law marriage consummated in the State of Michigan, the Washington court said:

> "While there is some difference of reasoning and ruling, the decided weight of authority is that where parties engage in a contract of marriage, which is void because one has a living lawful spouse, which is unknown to one or both, uninterrupted cohabitation and reputation after removal of the impediment, will produce a valid

common-law marriage, although the fact of the impediment or of its removal may not have been known to either. The principal reasons upon which the rule rests are that the initial relationship was intended to be matrimonial, not illicit, and consent to the present marriage evidenced by the ceremony continues from day to day and becomes effective as a present taking in marriage on removal of the impediment." 213 P.2d at 623.

It is probable, judging from Gallagher, that had this case arisen in the State of Washington, under the same facts, the validity of the marriage of Michael to Pauline would be sustained. In Gallagher, a ceremonial marriage ripened into a common-law marriage, in another state where such marriages were valid. In this case, Pauline contends that her common-law marriage, invalid in Washington, ripened into a valid common-law marriage in Montana where such marriages are valid. We have, however, no direct case authority from Washington precisely tracking the facts of the case at bar.

In this situation, the guardian contends that Montana must follow the choice of law rule that the local law of the state where the marriage is alleged to have occurred governs the question of the validity of the marriage. Cross v. Cross (1940), 110 Mont. 300, 102 P.2d 829. In Re Estate of Dauenhauer (1975), 167 Mont. 83, 535 P.2d 1005. In Cross, however, we had a case of Montana domiciliaries who had been married in Idaho, and who returned to Montana. There we determined there was no public policy difference between the State of Idaho and the State of Montana, and held invalid a marriage by a child who was not of the statutory age to be married and who had not the parent's consent. In Dauenhauer, this Court recognized the invalidity of a common-law marriage in California, but the marriage domicile was never established in Montana by the parties. We must determine therefore, under choice of law rules whether Montana's

- 9 -

substantive law can be applied to uphold the marriage between Michael and Pauline, and if so, what is the substantive law to be applied to the case at bar.

Restatement Second of Conflicts, § 283, provides:

"The validity of a marriage will be determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the spouses and the marriage under the principles set forth in section 6."

The principles set forth in Restatement Second of Conflicts, § 6, are:

"(a)   The needs of the interstate and international systems,

"(b)   The relevant policies of the forum,

"(c)   The relevant policies of other interested states and the relative interests of those states in the determination of a particular issue,

"(d)   The protection of justified expectations,

"(e)   The basic policies underlying the particular field of law,

"(f)   Certainty, predictability, and uniformity of result,

"(g)   Ease in the determination and application of the law to be applied."

Under comment (f), to Restatement Second of Conflicts, § 283, it is said:

"The state where the marriage was celebrated, or in the case of a common-law marriage, the state where the parties cohabited while holding themselves out as man and wife, is the state which would usually be primarily concerned with the question of formalities . . ."

In the application of Restatement Second of Conflicts, § 6, we come down on the side of applying Montana law every time. Montana is strongly inclined to recognize the validity of marriage; it specifically recognizes common-law marriages by statutory (section 40-1-403, MCA,) and case law; the amount of Workers' Compensation benefits will be determined

by Montana law; the wrongful death causes will be determined by Montana law; Washington retains no interest in the outcome of the validity of the marriage in this case; and the applicable Montana law is more easily determined in a case of this kind than is the Washington law. We therefore look to Montana's substantive law relating to common-law marriages and their validity, to apply to this case.

The public policy of this state with respect to marriages can be gathered from the statutes under our marriage code. First, the act is to be liberally construed to promote its underlying purposes, one of which is to strengthen and preserve the integrity of marriage and to safeguard family relationships. Section 40-1-101, MCA. Certain marriages are prohibited in Montana, such as bigamous and incestuous marriages. Section 40-1-401(1), MCA. In those prohibited marriages however, persons who cohabit after the removal of the impediment are lawfully married as of the date of the removal of the impediment. Section 40-1-401(2), MCA. Common-law marriages are specifically not invalidated. Section 40-1-403, MCA. The rights of putative spouses are protected in section 40-1-404, MCA, where any person has cohabited with another to whom he is not legally married in the good faith belief that he was married.

In Estate of Schanbacher (1979), 182 Mont. 176, 595 P.2d 1171, we set aside a summary judgment on the ground that a bigamous marriage may have ripened into a common-law marriage after the death of the decedent's first spouse.

Thus in Montana, under statutory and case law, a marriage prohibited by law in Montana may yet ripen into a valid marriage when the impediment is removed. We see no difference in logic, and therefore hold that a marriage which

may be invalid where contracted, but which would be valid in Montana, will be recognized by this State as valid if the marriage otherwise comports with our marriage laws, and if under choice of law rules, Montana law is to be applied.

The guardian contends, however, that even under Montana law, we may not recognize a valid common-law marriage here because under our law, a common-law marriage must take place immediately, or not at all. Estate of McClelland (1975), 168 Mont. 160, 541 P.2d 780.

While that statement appears in the case cited, and others, it is not determinative here. In addition to the consent required for a valid common-law marriage, there must be cohabitation and public repute of the marriage. The latter two factors do not take place instantly, but are continuing factors that extend through the life of the marriage. See Welch v. All Persons (1926), 78 Mont. 370, 254 P. 179. Here the beginning date of the common-law marriage was the date of their mutual consent to be married, September 4, 1982. At the time of their original consent, their marriage was invalid in the State of Washington. On their removal to Montana, however, a different law applied. In this case Pauline gave up her job, with its prospects for promotion, her residency in the State of Washington, transferred her bank accounts and property, and devoted herself and her property to Michael in performance of her marriage agreement. The requirement for certainty of time for the beginning of the common-law marriage was met when the parties moved to Montana, a state where common-law marriages are valid, and where thereafter they cohabited, and by public repute were husband and wife. We are buttressed in this by

the United States Supreme Court case of Travers v. Reinhardt (1906), 205 U.S. 423, 27 S.Ct. 563, which states:

"We are of the opinion that even if the alleged marriage would have been regarded as invalid in Virginia for want of license, had the parties remained there, and invalid in Maryland for want of a religious ceremony, had they remained in that state, it was to be deemed a valid marriage in New Jersey after James Travers and the women Sophia as husband and wife, took up their permanent residence there and lived together in that relation, continuously, in good faith, and openly up to the death of Travers, being regarded by themselves and the community as husband and wife. Their conduct toward each other in the eye of the public, while in New Jersey, taken in connection with their previous association, was equivalent in law to a declaration by each that they did, and during their joint lives were to, occupy the relation of husband and wife. Such a declaration was effective to establish the status of marriage in New Jersey as if it had been made in words of the present tense after they become domiciled in that state." (Emphasis added.) 27 S.Ct. 568-569.

Under our applicable law, therefore, we hold the common-law marriage of Michael and Pauline Imel Murnion to be valid.

As a final issue, the guardian attacks the statement of the District Court under section 40-1-404, MCA, that Pauline was a putative spouse so that even if she was not legally married in Montana, but cohabited with Michael in the good faith belief that she was married, she was entitled to all the rights of a putative spouse. What we have said foregoing respecting the validity of the marriage removes any need to discuss this issue. The District Court added the putative spouse provision as a further reason for upholding the marriage. Argument could be made, as the guardian has argued, that Pauline was not possessed of a good faith belief that she was legally married because her marriage was originally invalid under Washington law. On the other hand, the facts found by the District Court seemed to indicate that

- 13 -

she did in fact entertain a good faith belief that her common-law marriage was valid. In any event, the issue makes no difference because we have determined that in this case she was legally married to Michael Murnion at the time of his death.

Affirmed.

_____
                  Justice

We Concur:

_____
Chief Justice


_____

_____

_____

_____
                  Justices

APPENDIX

FINDINGS OF FACT

AND

CONCLUSIONS OF LAW

1. Michael W. Murnion died on April 5, 1982, at the age of 31 years. At the time of death, the decedent was domiciled in Rosebud County, Montana. Michael W. Murnion died intestate.

2. On June 2, 1982, Pauline G. Imel applied for appointment as Personal Representative of the Estate of Michael W. Murnion, naming Katrina Patricia Murnion, his daughter, and herself as his sole heirs. An Order so appointing her the Personal Representative of the Estate of Michael W. Murnion and Letters of Appointment were issued by the Clerk of the District Court on June 3, 1982. Notice and Information to Heirs, dated June 4, 1982, was mailed to Katrina Patricia Murnion in care of Sherrie Lynn Hart on June 4, 1982.

3. Pauline G. Imel filed a petition for adjudication of Intestacy and Determination of Heirs in the above-entitled cause on or about October 11, 1982. An Order fixing the time of hearing on said Petition for Monday, the 8th of November, 1982, was issued by the Clerk of the District Court on October 13, 1982. Notice of said hearing and proof of service by mail thereof upon Katrina Murnion, in care of her mother, Sherrie Lynn Hart, and her mother's then attorney, William Gissberg, as well as Bradley J. Luck and Pauline G. Imel, was made on October 20, 1982. The original time for hearing on the Petition for Determination of Heirs was continued on several occasions. The matter was initially reset for November 22, 1982 and Notice of the new time and date of hearing was again served upon Katrina Murnion, in care of Sherrie Lynn Hart, and her then attorney, William Gissberg, and Bradley J. Luck and Pauline Imel on October 29, 1982. The matter was subsequently reset for January 17, 1983, on November 22, 1982, and Notice of this resetting was again mailed to Katrina Murnion, in care of Sherrie Lynn Hart and her then attorney, William Gissberg, on December 17, 1982. Upon Motion of counsel for Sherrie L. Hart, guardian of Katrina P. Murnion, the hearing set for January 17, 1983 was continued and reset for February 22, 1983, and Notice of this resetting directed to Regnier and Lewis, P.C., as attorneys for Sherrie Lynn Hart and Katrina P. Murnion, as well as Brad Luck, George Dalthorp and Gregory Black, was mailed by Petitioner's counsel on January 11, 1983.

4. Michael and Pauline met in Renton, Washington, in November, 1980. Prior to that time, Michael and Pauline had been married to other parties, and those marriages were dissolved by divorce. Michael and Pauline began to date one another toward the end of March or the first of April, 1981, and from that time forward had a close and continuing relationship. During this time the parties maintained separate residences. Pauline resided in Tukwila, Washington, and was employed as a financial clerk by the City of Renton,

Washington at a salary just under ten dollars per hour. Michael resided in Redmond, Washington, sharing an apartment with a buddy, and was employed as a laborer in the roofing industry around the Seattle area. Sometime before the middle of June, 1981, Michael had proposed marriage to Pauline, but Pauline had declined his proposal for the reason that it was "too soon" in their relationship. She did not feel that Michael or she had known one another long enough, she had not met with Michael's family, she had reservations about their difference in age, he was 30 and she 40, and the fact that she was unable to bear him children.

5. About the middle of June, 1981, Michael's roommate decided to move, necessitating a change in Michael's living arrangements. Due to a lack of jobs in the roofing business, Michael could not afford apartment rental and pay his other bills. As a result of conversations between themselves, it was decided by Pauline and Michael that he would move into her apartment in Tukwila, and the parties thus commenced living together.

6. From the middle of June, 1981, until approximately the first part of September, 1981, Michael and Pauline continued to live together in Tukwila. In late June, 1981, Michael had brought Pauline to the family ranch at Shawmut, Montana to meet his family at its annual barbecue. The parties discussed the prospect of marriage during this time, but made no commitment to one another. They maintained separate bank accounts and did not purchase any property together. What income Michael was able to earn was used to pay bills he had accumulated prior to their relationship, and Pauline used her income to pay the apartment rental and everyday expenses.

7. Events changed Michael and Pauline's situation the first of September, 1981, and those events changed their relationship. On Wednesday, September 2, 1981, Michael received a call from his brother, Mark, who lived in Colstrip, Montana, and worked as a boilermaker on Colstrip Units 3 and 4. Mark called Michael to advise that they were hiring workers for Colstrip Projects 3 and 4 and that if he was interested, Michael could come out to Colstrip to work as a boilermaker again, as he had during the construction of Units 1 and 2. This prospect offered Michael a good-paying full-time job, and he was excited by those prospects. Michael discussed these prospects with Pauline, and she encouraged him to pursue such employment. The following day, Thursday, September 3, 1981, Michael did some further checking into the employment situation at Colstrip by speaking again with his brother, Mark, and calling supervisory personnel for whom he had worked before. That evening, Pauline and Michael again discussed the job situation; Pauline encouraged Michael, and Michael hinted that he would not accept the employment unless she would go to Colstrip with him. He went on to describe for Pauline the aspects of living in Colstrip, Montana, as opposed to the Seattle area.

8. On Friday evening, September 4, 1981, Michael and Pauline had a serious and consequential discussion concerning the job prospect and their relationship. Michael advised

Pauline that he would not come to Montana unless she would come with him. There followed a discussion of life in the Colstrip area, the fact that Pauline would be giving up a good-paying job, which promised promotion, the fact that Pauline could no longer continue her college courses, the disparity in their ages, her inability to bear him children and the prospects for adoption, and in short, all the questions one discusses when considering marriage. Pauline wanted to come to Montana with Michael and agreed to do so. Michael then asked Pauline if she would come to Montana as his wife. Pauline told him that she would. He said he wanted to bring her out here and introduce her as his wife, and she so agreed. (Tr. p. 22). Insofar as Pauline and Michael were concerned, they had become man and wife by virtue of this agreement, and there was nothing further for them to do before they considered themselves man and wife. (Tr. p. 73 and p. 112).

9. Upon arriving at this agreement, Michael and Pauline undertook steps to carry out their intention of moving to Montana and obtaining employment for Michael at Colstrip. Pauline gave notice to her employer the next workday. Michael arranged for repairs to his pickup and finished up a roofing project the following week. Thereafter, Michael came to Montana to obtain employment and a place of residence, bringing with him $1,000 which Pauline had withdrawn from her savings account in order to cover travel expenses and down payment on a residence. At Colstrip, Michael lived with his brother, Mark, while finding a residence, secured employment, made arrangements to purchase a mobile home, and subsequently returned to Tukwila to move Pauline and their belongings back to Montana. During Michael's absence, Pauline made arrangements for a U-Haul and packed their belongings. Michael returned to Colstrip with Pauline and their belongings on October 6, 1981.

10. During Michael's visit to Colstrip to obtain his job and housing, Michael arranged to purchase a mobile home from one Marla Goodman. Marla Goodman testified, and the Court finds that during the course of conversations regarding purchase of the mobile home, Michael told Marla Goodman that he had to return to Washington to bring his wife back out to Montana and that he and his wife would be jointly purchasing the trailer home. Upon Michael and Pauline's arrival in Colstrip, they found the mobile home in need of some immediate repairs, and Michael telephoned Marla Goodman for the purpose of requesting those repairs. Marla testified, and the Court finds that upon her arrival at the trailer, Michael introduced Pauline to her as his wife. Arrangements for the repairs to the mobile home were made, and Michael and Pauline took up residence therein.

11. Arrangements for the purchase of the mobile home from Marla Goodman were made through Warren Becker of Big Sky Realty at Forsyth, Montana. Warren Becker testified, and the Court finds that in the course of negotiating the trailer home purchase, he was made aware that Michael was purchasing the trailer together with Pauline, that Pauline had the $2,000 for the down payment on the home, and that Michael had to return to Washington to bring her back out to Montana. Mr. Becker also testified that during the course of negotiation, he became aware that Michael and Pauline were

not, in fact, formally married, but understood that they were soon to be formally married. In the course of preparing the contract for title to the mobile home and other papers, Mr. Becker inquired as to what name Michael and Pauline wished the trailer to be placed in. He testified, and the Court finds that Michael and Pauline stated a desire to have title placed in the name of Michael Murnion and Pauline Murnion, but that Mr. Becker advised Michael and Pauline that because they were not legally married, Pauline's legal name remained Pauline Imel, and she could not use the name Pauline Murnion until they had been formally married. It was Pauline's understanding from this information that in order to protect her property rights in the mobile home, it was necessary for her to use the name Imel, rather than Murnion. For this reason, the contract for title and other documents were drawn up in the name Michael W. Murnion and Pauline G. Imel, and Pauline so executed the documents. Mr. Becker testified that from his observation, Michael and Pauline appeared to be an affectionate and loving couple and that aside from the fact that he knew they were not formally married, they otherwise appeared to hold themselves out as man and wife in Colstrip.

12. Neighbor, Larry Morton, met Michael and Pauline soon after they had moved into the mobile home at Colstrip. Larry Morton testified, and the Court finds that he first met Michael and that during the course of their conversation, he referred to Pauline as his wife. From that point forward, Michael continued to refer to Pauline as his wife in conversations with Larry, and Pauline referred to Michael as her husband in such conversations. It appeared to Mr. Morton in all respects that Michael and Pauline held themselves out to the community as husband and wife, and he was unaware of the fact that they were not formally married until after Michael's death. After Michael's death, Mr. Morton heard rumors in the Colstrip community to the effect that Michael and Pauline were not formally married. He was, in fact, advised of this fact by an investigator who approached him following Michael's death.

13. Neighbor, Keith Hanson, a Protestant minister in the Colstrip community, first met Pauline when he asked to borrow a ladder which he had seen Michael use to build an attachment to the mobile home. In requesting use of the ladder, Reverend Hanson asked Pauline if "he could use her husband's ladder." Reverend Hanson later returned the ladder to Michael, thanking him for its use, and referring to Pauline during the course of the conversation as Michael's wife. Neither Michael nor Pauline made comment upon use of the terms "husband" or "wife," and in Reverend Hanson's observation, it appeared that Michael and Pauline were husband and wife. He, too, was unaware of the lack of a formal marriage until after Michael's death.

14. In order to license Michael's pickup after their arrival at Colstrip, it became necessary to obtain automobile liability insurance. Michael asked Pauline to make arrangements for that insurance, which she obtained through the Tillett Insurance Agency at its Colstrip office. The application for this insurance (Petitioner's Exhibit No. 1) was filled out by a clerk at the insurance agency, and the information thereon taken from Michael and Pauline's drivers

licenses, which they had brought with them from Washington state, and a prior insurance policy held by Michael on the pickup. In the course of filling out the policy application, the clerk initially showed Michael and Pauline's marital status as single, or not married. Pauline had the clerk change this status to "yes married," and signed the application, dated October 15, 1981, and Pauline G. Murnion. This was done prior to Mr. Becker's advice concerning the "legal name" Pauline must use on the closing for the mobile home, which was accomplished on November 7, 1981.

15. After arriving in Colstrip, Pauline made arrangements to transfer her savings account from a Seattle area bank, where she had approximately $10,000 on deposit in her sole name. That money was transferred to the Security Bank at Colstrip in her name in placed in a savings account under the name of Pauline G. Imel. At the time this account was transferred, Pauline set up a checking account, which was placed in the name of Pauline G. Imel, to which she had added the name of Michael W. Murnion. It was from Pauline's savings account that the $2,000 down payment on the mobile home was made, and from this account, other withdrawals were made to finance down payment on joint purchases made by Pauline and Michael. The joint checking account was used for the deposit of Michael's and later, Pauline's, salary and the payment of their monthly bills and expenses. Michael later establised a savings account in his sole name, in which he deposited approximately $20 per week to finance a surprise trip for him and Pauline to Ireland. There was $600 in Michael's savings account at the time of his death.

16. Prior to meeting Pauline, Michael had purchased and owned a wedding and engagement ring set. Before moving to Montana, Michael and Pauline attempted to make arrangements with a Seattle jeweler to exchange this set for a three-ring set, so that he would have a wedding ring, and Pauline would have a wedding ring and engagement ring. Those arrangements could not be made, and the set Michael owned did not fit Pauline in that the wedding band fit loosely around the engagement ring and had a hook on it which caught on her clothing. Before coming to Montana, Pauline asked Michael if he would mind if she placed a diamond ring which she previously owned and wore on her right hand, on her left hand. Michael agreed, and she wore it on her left hand after that time. It remained Michael and Pauline's intention to exchange the wedding ring set Michael owned, but this was never accomplished. In December, 1981, Michael's ring set came up in conversation, and he asked Pauline if she would have the ring set, to which she agreed. Michael then gave her both the engagement ring and the wedding band. Pauline initially wore both of these rings on her left hand, but later removed the wedding band due to its ill fit and the hook.

17. On or about December 7, 1981, Pauline sought and obtained employment with Bechtel Power as an accounts receivable clerk. She used the name Imel on her application and other employment records, showing herself to be a single woman; however, she was known among her co-workers as Pauline Murnion, Michael's wife, at least until certain workers

apparently read her employment information and disclosed the information thereon.

18. May Ellen Watson, one of Pauline's co-workers at Bechtel, first learned of Michael and Pauline through Mark Murnion, Michael's brother, who was a friend of Mrs. Watson's son, Dan. Mrs. Watson had discussed with Mark the fact that there were quite a few Murnion brothers living in and around Colstrip, and among those brothers was Michael and Pauline to whom Mark referred as his "sister-in-law." After that, Pauline came to work at Bechtel, where Mrs. Watson already worked. When Pauline commenced employment at Bechtel, she was introduced to Mrs. Watson, and Mrs. Watson, knowing of Pauline through Michael's brother, Mark, believed her to be Pauline Murnion, Michael's wife. Mrs. Watson first met Michael Murnion when he came to eat lunch with Pauline, and one of the other girls in the office introduced Michael as Pauline's husband. From her observations, it appeared to Mrs. Watson that Michael and Pauline were husband and wife. Approximately two months to six weeks before Michael's death, Mrs. Watson was advised by another girl in the office that Michael and Pauline were not formally married. Mrs. Watson subsequently discussed this fact with Pauline; Pauline told her that it was true, that they intended to formalize their marriage, but that she felt that she was Michael's common-law wife (Tr. p. 151 and 1. 21) and Pauline continued to refer to herself as Michael's wife, not his fiancee. (Tr. p. 151 1. 16-19). Mrs. Watson stated they they, Michael and Pauline, thought they were already married (Tr. p. 154 1. 2-4).

19. Sometime before March, 1982, Michael and Pauline requested Martha Dreiling to prepare their 1981 tax returns. Martha Dreiling was a long-time family friend of the Murnions, who had previously prepared tax returns for a tax service in Billings, Montana. In requesting that Mrs. Dreiling prepare the tax returns, Michael asked that they be prepared as married, filing jointly. In discussion, Mrs. Dreiling pointed out to Michael that there was tax savings involved in filing as a single person, and Michael therefore asked her to calculate it both as married, filing jointly, and as individual single persons, which Mrs. Dreiling did. Due to the tax savings, Michael and Pauline filed separate tax returns. In the course of their discussions, Mrs. Dreiling advised Michael that it would be legal for him to file either way. She felt that he and Pauline had established a common-law marriage by cohabitation and introducing one another as husband and wife, although she knew as a close family friend that Michael and Pauline were not formally married. It was Mrs. Dreiling's belief that they had established a common-law marriage by cohabitation.

20. In discussion of the tax returns, Martha Dreiling and Michael and Pauline discussed the need for Michael and Pauline to find an investment which would give them certain tax writeoffs. Michael and Pauline's joint income at the time was substantial. Martha Dreiling suggested the purchase of an apartment building and, in fact, owned one herself which she wanted to sell. After checking on the advisability of such a purchase, Michael and Pauline agreed to purchase a three-unit apartment from Martha Dreiling and her husband. The terms of purchase called for a down payment of $4,000 and

this payment was made from Pauline's savings account. As with the trailer, the apartment was placed in the names of Michael W. Murnion and Paulin G. Imel.

21. Pauline received mail in Colstrip as Pauline Murnion, Mrs. Michael Murnion, and Michael and Pauline Murnion, both before and after Michael's death. She also received mail in the name of Pauline Imel and other mail simply addressed to Michael and Pauline.

22. In the winter of 1982, Michael and Pauline took dance lessons at Colstrip. Several couples participated in that dancing class, and Michael and Pauline were known in the class as Michael and Pauline Murnion (Petitioner's Exhibit No. 4).

23. From the testimony, it appears that Michael and Pauline planned and intended to be formally married by license and solemnization, but this intention was never carried out prior to Michael's death. The Court finds from the testimony that although Michael and Pauline had this intention, they did not consider it essential to their marriage, as between themselves. Their purpose in obtaining a formalization of their marriage was "to make it legal" and acceptable to society, in particular, Michael Murnion's parents, Marion and James Murnion. Pauline's testimony on this point was verified by the testimony of Michael's brother, Mark, who stated that Michael "wanted to make it legal, you know, he told me considered her as his wife." Mark further testified that the only reason he wished to make it legal was to satisfy their parents "because they (Pauline and Michael) figured they were already married, you know, the way he (Michael) told me." (Tr. p. 142 l. 1-8). And, "they had their real commitment with their heart, and I can tell that, I knew my brother very well." (Tr. p. 142 l. 18).

24. Michael's parents, Marion and James Murnion, testified, and the Court finds, that although the parents did not necessarily accept or recognize the validity of Michael and Pauline's marriage, they knew from what Michael told them, that he considered Pauline to be his wife. (Tr. p. 169 l. 20 and p. 183 l. 5-10). Although Michael wanted to formalize his wedding either civilly or in the Catholic Church, following an annulment of his and Pauline's prior marriages, in order to please his father (Tr. p. 176 l. 6), Michael's father believed that Michael "considered himself married and had obligations at that point," before any such ceremony. (Tr. p. 183 l. 5-10).

25. Michael's death certificate and the obituary printed in several papers following his death, indicated that he was a single man and that Pauline was his fiancee. Information in these obituaries was obtained from Michael Murnion's parents. Mr. and Mrs. Murnion testified, and the Court finds that the reason for this was that Mr. and Mrs. Murnion did not recognize Michael and Pauline's marriage as legal. Mrs. Murnion testified that although she knew Michael considered Pauline his wife, she knew that they were not legally married and did not believe that Pauline could be listed as his wife in an obituary or death cerificate. Yet, Mrs. Murnion wanted to recognize the special relationship

Michael had with Pauline. She therefore had Pauline listed as a fiancee as a matter of special honor for Pauline, a listing she stated would not normally be made in an obituary for a fiancee.

26. At the time of Michael Murnion's accident, Pauline rushed to the emergency facilities at Colstrip to be at his side. She informed medical personnel at the scene that she was Michael's wife and stood by him while she could. Upon his death, she aided in funeral arrangments and suggested the military funeral which the family subsequently followed through with.

27. There is no question, from the evidence, but that Michael and Pauline were a very close, loving, affectionate and caring couple. From all outward appearances, they had a deep and abiding commitment to one another.

28. Although Michael and Pauline made their agreement to be man and wife while residing in Tukwila, Washington, they did so with the intent of moving to Montana, and they followed through with that intention by moving to Montana soon thereafter. All the elements of their common-law marriage were fulfilled in Montana by virtue of their continuing agreement, cohabitation, and mutual assumption of the marital relationship and public repute. Montana remained their residence from that time forward, and Montana clearly has a more substantial relationship to the parties and their marriage than any other state, including Washington.

29. Michael W. Murnion is the natural father of Katrina P. Murnion, age 4, born April 25, 1978. Sherrie Lynn Hart is the natural mother of Katrina P. Murnion.

30. By stipulation and order signed by Michael W. Murnion and issued by the Superior Court of Snohomish County, Washington on October 6, 1981, Michael W. Murnion stipulated that he was the father of Katrina P. Murnion, and the Washington Court declared that he was the legal father and had a duty to support his daughter.

31. Pauline G. Imel testified that she and Michael W. Murnion had a private oral agreement that they were married on September 4, 1981. She denied any marital relationship prior to that date, although she and Michael W. Murnion had been living together in her apartment in Tukwila, Washington since June of 1981 and continued to live together in that apartment for a month after the alleged Sepember 4, 1981 marriage until they left for Montana on October 4, 1981. (Tr. 74, 90, 92). She further testified that after September 4, 1981, nothing whatsoever remained to be done for her marriage to be complete and that the marriage was not contingent upon her moving to Montana.

32. Contrary to her testimony at trial whereby she set the date of her alleged marriage as September 4, 1981, Pauline G. Imel filed a Claim for Compensation for the Division of Workers Compensation of the State of Montana alleging a date of marriage with Michael W. Murnion as October 1, 1981. That Claim for Compensation was prepared with the assistance of her attorney and was signed under oath

by Pauline G. Imel in the presence of a Notary Public on October 19, 1982. On October 1, 1981 Pauline G. Imel and Michael W. Murnion had not yet moved from Washington to Montana. (Tr. 91, Defendant's Exhibit B, Tr. 92).

33. The only available direct evidence of the alleged agreement to be married on September 4, 1981 is the testimony of Pauline G. Imel, because Michael W. Murnion is now dead, and there were no other witnesses to the alleged agreement. The credibility of Pauline G. Imel is therefore extremely important in determining whether or not such an agreement was actually reached. Although Pauline G. Imel originally testified that she never represented her marital status as single after September 4, 1981 and that she did not represent to her employer, Bechtel Power Corporation, that she was single at the time of her employment application (Tr. 75), the records of her employer and her own testimony on cross examination does not support her original testimony. The Court finds that Pauline G. Imel's credibility is not to be discredited by testimony, as she was confused by the free legal advice given to her by Warren Becker, when they were purchasing the mobile home through his agency. She believed that she was married to the deceased, but could not legally use his name until an official marriage ceremony had been performed.

34. Michael W. Murnion and Pauline G. Imel filed separate federal income tax returns as a single man and a single woman for tax year 1981. She had already listed herself as a single woman for income tax purposes on her IRS form W-4, signed by her and filed with her employer on December 7, 1981. (Tr. 101-102).

35. Pauline G. Imel had an account at the Bechtel Credit Union, but did not list Michael Murnion as her husband on that account. She had medical insurance provided by Bechtel and did not list Michael Murnion as her husband on that insurance. (Tr. 105).

36. At the time of his death Michael W. Murnion was an employee of Combustion Engineering, Inc., where he worked as a boilermaker. On his Field Construction Service Employment Record, which was signed by him on October 12, 1981, Michael W. Murnion designated his marital status as "Single." (Defendant's Exhibit C). Pauline G. Imel conceded during cross-examination that it is true that Michael Murnion designated himself as a single person on the employee records at Combustion Engineering. (Tr. 103).

37. The evidence shows that at the time of his death, Michael W. Murnion and Pauline G. Imel intended to be married in the near future and were in the process of making the necessary arrangements to be married in the State of Montana. Michael W. Murnion was actively seeking annulments from the Catholic Church for their prior marriages, after they left Washington and came to Montana. (Tr. 94, 96).

38. Prior to moving to Montana, both Pauline G. Imel and Michael W. Murnion knew that Washington did not recognize common-law marriage. At the time of the alleged agreement Pauline Imel and Michael Murnion were residents and domiciliaries of the State of Washington. All of their

property, their apartment home, their automobile, and their bank accounts were located in Washington. They were employed in the State of Washington. They had no significant contact with the State of Montana at the time of the alleged agreement. The only contacts with the State of Montana at the time of the alleged marriage of September 4, 1981 were the fact that Michael Murnion was originally from Montana and the fact that they intended to move to Montana where Michael Murnion had an expectancy of employment. (He was not employed at the time of the alleged agreement, nor had he yet traveled to Colstrip, Montana to actually apply for employment there. His employment records show that he was not actually employed until October 12, 1981. (Defendant's Exhibit C.)

Mr. Chief Justice Frank I. Haswell, dissenting:

I question the trial court's legal conclusion that the evidence supports a finding of common law marriage.

We have traditionally phrased our test of the existence of a common law marriage in terms of consent, habit and repute. Cohabitation with habit and repute are merely the means of proving the first, and primary, element of any marriage--consent.

> ". . . the consent, whether in express words, or implied from conduct, must always be given with such an intent on the part of each of the parties that marriage cannot be said to steal upon them unawares. One cannot become married unwittingly or accidentally. The consent required by our statute, as well as the statutes of every state, and by the common law, must be seriously given with the deliberate intention that marriage result presently therefrom. The words manifesting the consent may be spoken in the face of the church, or immediately preceding an act of sexual intercourse, as claimed in this case. But they must always be spoken by those who know and intend that matrimony in full form shall be the result. Marriage cannot be created piecemeal. It comes instantly into being, or it does not come at all. If anything remains to be done before the relationship is completed in contemplation of the parties themselves, there is no marriage.

> "'In order to constitute a marriage per verba de praesenti, the parties must agree to become husband and wife presently. The consent which is the foundation and essence of the contract must be mutual and given at the same time, and it must not be attended by an agreement that some intervening thing shall be done before the marriage takes effect, or that it be publicly solemnized. That is to say, it must contemplate a present assumption of the marriage status, in distinction from a mere future union. (Lord Brougham in Queen v. Millis, 10 Cl. & F. 534, 708, 730; Clark v. Field, 13 Vt. 460.)' (Beneficial Assn. v. Carpenter, 17 R.I. 720, 24 Atl. 578.)" State v. Newman (1922), 66 Mont. 180, 313 P. 805.

25

Newman involved a rape charge and an alleged, and very brief, marriage. Both parties were alive at the time of trial. Our cases more often involve an estate or insurer and a spouse or alleged spouse claiming common law marriage. This is true in the present case.

"[T]he best evidence of the exchange of marriage consent between the parties would come from those who were personally present when they mutually agreed to take each other as husband and wife, and to assume all the responsibilities of that relation." Travers v. Reinhardt (1907), 205 U.S. 423, 436, 27 S.Ct. 563, 51 L.Ed. 865. Rarely is more than one of those "personally present" available to testify at trial. Our law has developed in an attempt to guide the courts in their examination of surviving fact as proof of the thoughts and intentions of the missing partner to the marriage.

A marriage may be inferred from cohabitation and reputation as husband and wife. Once these facts are brought forward, we shift to the opponent the burden of disproving the marriage. Elliott v. Industrial Accident Board (1956), 101 Mont. 246, 53 P.2d 451. The proponent will, however, continue to bear the burden of proof where the relationship was illicit at its inception. Welch v. All Persons (1927), 78 Mont. 370, 384, 254 P. 179, 182. The rule is not a sanction or condemnation. It is, again, our way of protecting the intent of parties who can no longer speak for themselves. In the case relied on in Welsh, the proponent ably bore the burden of proof: a brief meritricious relationship preceded a public proclamation and twelve-year marriage. Howard v. Kelly (1916), 111 Miss. 285, 71 S. 391. In Estate of Swanson (1972), 160 Mont. 271, 502 P.2d 33, the

couple, after an _allegedly_ illicit beginning, privately celebrated their marriage and continued to live together for eight years.

The relationship, here, was admittedly illicit at its inception, and the parties knew it was illicit. We need not resort to state law, for the parties, themselves, did not intend a marriage at that time. Pauline testified that later, on September 4, 1981, while still in Washington, the couple agreed that they were married knowing such marriage was illegal under Washington law. I do not question Pauline's credibility or the weight given her testimony. I do question the effects of time and circumstances. The facts clearly show that the couple lived together as man and wife, but the facts also show a wavering, perhaps tenuous commitment to marriage. Both Michael and Pauline conducted a part of their lives as single people. Michael designated himself as a single person on his employment records. Pauline applied for work, kept her savings accounts, and purchased insurance in her own name without mention of Michael or marriage. A woman's continued use of her maiden name will not, in itself, defeat a claim of common law marriage. _Swanson_, supra. Although not legally determinative, Pauline's willingness to conduct a part of her life--particularly, but perhaps not surprisingly, the financial part of her life--as a single person, raises questions of the certainty of her commitment. Now, when only the rewards remain, human nature may choose to strengthen, in retrospect, that which was tentative at the time.

The couple lived together ten months. They filed separate tax returns, taking advantage of the lower tax accorded two single people rather than be taxed on their

27

combined income as a married couple. We have already voiced our disapproval of marriage claimed only for financial convenience. Estate of Peltomaa (Mont. 1981), 630 P.2d 215, 38 St.Rep. 943. The same can be said of a convenient claim of single. Michael and Pauline purchased their mobile home and apartment house as tenants in common rather than as joint tenants with rights of survivorship. Few married couples of moderate means choose to hold property as tenants in common.

We have always offered a true common law marriage the same protections given formal marriage. By necessity, the same duties are imposed. A couple may not walk in and out of their marriage at whim. Michael and Pauline appear to have left the door open.

The majority, in discussing the question of Montana validity of the Washington marriage, fails to give proper attention to our requirement that a man and woman give mutual consent to a present assumption of the marriage status. Newman, supra. The question is not whether the marriage ripened into legal marriage in Montana but whether the couple, knowing their present consent to be ineffective and predicating its validity upon a future move, consented to a present assumption of the marriage status. The majority relies on Travers to hold the earlier consent effective upon the move to Montana. The cases are not analogous. Travers involved only legal recognition of a marriage freely consented to at its inception. The Traverses lived together as man and wife for eighteen years, openly and constantly, conducting themselves towards each other for such a length of time as to produce a general belief that they were married. The Travers will verified the relationship as one of marriage. Travers, supra, 205 U.S. at 441.

28

Michael and Pauline lived together for ten months. Their reputation as man and wife is inconsistent, at best. Their steps toward formal marriage or formal solemnization of the marriage that existed, if it existed, were only haltingly taken. There is, here, no bright line or long mosaic of marriage. The facts do not support a finding of common law marriage.

I would reverse.

_____
Chief Justice


Mr. Justice John Conway Harrison:

I concur in the foregoing dissent of Mr. Chief Justice Haswell.

_____
Justice