No.  93-308

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

IN THE MATTER OF THE ESTATE OF
FRED ALCORN,
      deceased.

APPEAL FROM:  District Court of the Eighth Judicial District,
              In and for the County of Cascade,
              The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

            Donald J. Hamilton and Steven T. Potts; Jardine,
            Stephenson, Blewett & Weaver, Great Falls, Montana

      For Respondent:

            Donald L. Ostrem; Graybill, Ostrem & Crotty, Great
            Falls, Montana

FILED

FEB 11 1994

Filed:  *Ed Smith*
      CLERK OF SUPREME COURT
        STATE OF MONTANA

Clerk

Submitted on Briefs:  December 2, 1993

              Decided:  February 11, 1994

Justice John Conway Harrison delivered the Opinion of the Court.

This is an appeal from the Eighth Judicial District Court, Cascade County. Appellant Robert A. Alcorn (Robert), as personal representative of his father's estate, appeals the District Court's determination that a common-law marriage existed between respondent Kathee Melinda Young (Kathee) and Fred "Fritz" Alcorn (Fred), the decedent. In this matter of probate, Kathee asserted rights to an elective share of the augmented estate, a homestead allowance, an exempt property allowance and a family allowance. Robert appeals.

Fred and Kathee met on August 27, 1981, at Metra Park, a horse racetrack in Billings, Montana. At the time of their meeting, Kathee was separated from her husband, Fred Young (Young). Kathee's divorce from Young was complete in May 1985. From the day they met in August 1981, Fred and Kathee cohabited until Fred died on May 10, 1991. The couple first lived together in Great Falls, but soon moved to Fred's ranch house in Vaughn, Montana.

Kathee, 46, has been a Delta Airlines flight attendant for seventeen years. Fred, who died at age 59, owned and operated an automobile dealership in Great Falls. The couple shared a common interest in horses and in horse racing. In fact, they jointly owned race horses and regularly attended horse races together. Throughout her relationship with Fred, Kathee retained her last name and filed her tax returns as a single person; however, the couple did share joint bank accounts at First Liberty Credit Union in Great Falls.

2

During the time Kathee and Fred were together, Fred was plagued with physical ailments--including heart problems, back problems which required surgery, throat cancer which required surgery, and a lung removal which required related surgeries. Fred died of a heart attack on May 10, 1991.

In his will, Fred designated his son, Robert, as the personal representative of his estate. On October 1, 1991, Kathee filed a Notice of Election Against Will by Surviving Spouse. Kathee contends that she and Fred had a common-law marriage from the day they met until the day Fred died. Robert challenges this assertion.

By will, Fred devised to Kathee one-half of the net value of his ranch and all of his household furniture and household goods. Kathee additionally sought the following entitlements: one third of the augmented estate, pursuant to § 72-2-223, MCA; a homestead allowance of $20,000, pursuant to § 72-2-412, MCA; an exempt property allowance not to exceed $3,500, pursuant to § 72-2-413, MCA; and a family allowance, pursuant to § 72-2-814, MCA.

The District Court conducted a non-jury trial in July and August 1992, and entered its findings of fact, conclusions of law and judgment on February 22, 1993. The District Court concluded that Kathee was Fred's common-law wife and, therefore, granted her the entitlements she sought as Fred's surviving spouse.

The sole issue before this Court is whether the District Court properly determined that a common-law marriage was established by Kathee Young.

3

The standard we apply in analyzing a district court's findings of fact is whether they are clearly erroneous. Steer, Inc. v. Dep't of Revenue (1990), 245 Mont. 470, 474, 803 P.2d 601, 603; see also Interstate Production Credit v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287. When reviewing conclusions of law, we determine whether the court's interpretation of law is correct. Steer, Inc., 803 P.2d at 603.

Montana recognizes the validity of common-law marriages. Section 40-1-403, MCA. A rebuttable presumption exists in favor of a valid marriage when "[a] man and a woman deporting themselves as husband and wife have entered into a lawful contract of marriage." Section 26-1-602(30), MCA.

> In order to establish the existence of a common law marriage, the party asserting the marriage must show 1) the parties are competent to enter into a marriage; 2) assumption of such a relationship by mutual consent and agreement; and 3) cohabitation and repute.

In re Marriage of Geertz (1988), 232 Mont. 141, 145, 755 P.2d 34, 37 (citation omitted).

Robert argues that Kathee failed to prove that she and Fred were ever married. Robert contends that Kathee was not competent to marry Fred until May 1, 1985, when her divorce with Young was finalized. According to Robert, Kathee failed to introduce evidence that she and Fred agreed to marry one another after her divorce in 1985. Robert asserts that "marriage cannot occur in a piecemeal fashion, but rather comes instantly into being or does not come at all." Estate of White (1984), 212 Mont. 228, 231, 686 P.2d 915, 916. This Court addressed the same issue in Estate of

4

Murnion (1984), 212 Mont. 107, 686 P.2d 893. In deciding that this concept was not determinative, we stated:

> In addition to the consent required for a valid common-law marriage, there must be cohabitation and public repute of the marriage. The latter two factors do not take place instantly, but are continuing factors that extend through the life of the marriage.

Murnion, 686 P.2d at 899 (citing Welch v. All Persons (1926), 78 Mont. 370, 254 P. 179).

The following exchange occurred at the August 17, 1992, hearing:

Q. [By Donald Ostrem, Kathee's attorney] Okay. Now there are several items that you and I have talked about involving common law marriage. Did you feel that you were married to Fritz Alcorn?

A. Yes, I did.

Q. And did you during the entirety of your relationship feel that you were married to Fritz Alcorn?

A. Yes, I did.

. . .

Q. Now, did you state that you--when you first started living together, you were in the process of getting a divorce from your previous husband. And you did get that divorce?

A. Yes.

Q. So you also had the capability of consent at the time that you got that divorce is that correct?

A. Yes.

Kathee testified that she and Fred were capable to consent to marriage. She also testified that neither she nor Fred were incompetent or suffering from any disabilities.

We determine, as a matter of law, that Kathee and Fred were

5

incapable of consenting to marriage until Kathee's divorce with Young became final on May 1, 1985. However, persons who cohabit after the removal of the impediment may become lawfully married as of the date of the removal of the impediment. Section 40-1-401(2), MCA; see also Murnion, 686 P.2d at 899; Estate of Schanbacher (1979), 182 Mont. 176, 595 P.2d 1171. Therefore, when Kathee's divorce to Young became final, the impediment to her common-law marriage to Fred was removed.

Having determined that Kathee and Fred were competent to marry after May 1, 1985, we turn our discussion to whether Kathee and Fred assumed a common-law marriage by mutual consent and agreement. See Geertz, 755 P.2d at 37. In support of her contention that she and Fred mutually consented and agreed to marriage, Kathee claims to have a wedding ring given to her by Fred. The ring, which she wore to the August 17, 1992, hearing, contains two intertwining horseshoes made with Yogo sapphires. According to Kathee, "Fritz had it designed and had it made. And the bracelet--he got a bracelet for me to match." In addition to the ring and bracelet, Kathee and Fred incorporated the intertwining horseshoe design into their home in Vaughn. The couple had horseshoes cemented into the concrete walkway leading to their house, with their names etched into the concrete beneath the horseshoes.

At the August 17th hearing, the following question was asked: "Did you both agree that you were married, that you were husband and wife?" Kathee responded, "Yes, we did." The combination of Kathee's wedding ring, the concrete design at the couple's home in

6

Vaughn, and Kathee's testimony indicates that Kathee and Fred mutually consented and agreed to a common-law marriage.

We look finally to cohabitation and repute. See Geertz, 755 P.2d at 37. It is clear from the record, and Robert agrees, that Kathee and Fred cohabited for about nine years--from the day they met until the day Fred passed away. They lived together for a short time in Great Falls before moving to Fred's house in Vaughn. In fact, it is apparent that the couple invested a great deal of time and money in decorating and refurbishing their home. However, as Robert correctly asserts, marriage "does not result from mere cohabitation alone." Miller v. Townsend Lumber Co. (1968), 152 Mont. 210, 219, 448 P.2d 148, 152 (citation omitted). Therefore, we now turn our attention to repute.

Robert contends that Kathee and Fred admitted in writing that they were not married after May 1, 1985. In support of his contention, Robert presented evidence that Kathee: 1) never changed her last name from "Young" to "Alcorn;" 2) did not list Fred as a beneficiary on her employee life insurance, health insurance or retirement forms; and 3) filed her tax returns as a single person throughout her entire relationship with Fred. Moreover, Fred stated in his will that he was a single man.

Kathee testified that she chose to keep the last name "Young" for professional reasons. Kathee testified that her mother was listed as beneficiary on her insurance, health and retirement forms. Kathee also testified that she filed her tax returns as a single person because she thought she could not file as "married"

7

unless the marriage was a matter of record and because her accountants "told [her] to file it that way."

This Court is unaware of any legal requirement that a wife assume the last name of her husband or that she list her husband as beneficiary on her insurance, retirement or health forms. The District Court accepted Kathee's explanations--including her rationale for filing her tax returns individually rather than as a married person--as valid. The District Court was in the best position to observe Kathee and her demeanor. See Marriage of Ernst (1990), 243 Mont. 114, 122, 793 P.2d 777, 782. We determine that the District Court's finding as to this issue is not clearly erroneous.

Robert next contends that each witness testified either that Fred and Kathee were not married or that they merely assumed or considered the couple as married. According to Robert, the fact that people assumed or considered the couple as married does not demonstrate that Kathee ever held herself out to be Fred's wife. See Estate of Slavens (1973), 162 Mont. 123, 126, 509 P.2d 293, 295.

The record, however, is replete with evidence and testimony that Kathee and Fred held themselves out to be husband and wife. Kathee and Fred shared joint checking accounts at First Liberty Credit Union. Kathee wore a wedding ring designed and made especially for her, compliments of Fred. The record indicates that Kathee and Fred spent all of their time--excepting work--together for nine years. Because the couple had a large home, they

8

regularly hosted members from both Fred and Kathee's families for holidays. Christmas at the Vaughn ranch became a tradition. The couple hosted barbecues and pool parties in the summer for family and friends. Kathee's family members referred to Fred as "Uncle Fritz."

Fred spent about eight years of his time with Kathee in poor health. Throughout Fred's illnesses, Kathee was by his side. The record indicates that Kathee cared for Fred through chemotherapy and through visits to Seattle for treatment.

Robert's daughter and Fred's granddaughter, Kara Alcorn, testified that she and her brother, Robert, who live in Washington, would visit Fred and Kathee in Vaughn. Kara testified that she considered Kathee and Fred to be married, that she received Christmas cards from the couple, and that she received information concerning changes in Fred's medical condition from Kathee.

Robert Layton, Kara's brother and Fred's grandson, testified that the relationship between Kathee and Fred was always portrayed to him as that of husband and wife. He further testified that he visited them every summer, that they "always were together" and that he considered them to be married. On occasion, Robert would go to the horse racetrack with Fred, who would introduce Robert as his "grandson" and Kathee as his "wife."

Judge John McCarvel, a district court judge in Cascade County, was a long-time friend of Fred's. Judge McCarvel used to see Fred run his horses at racetracks in Spokane, Billings and Great Falls. The Judge testified that he considered Fred and Kathee to be

married, that Fred always introduced Kathee as his wife, and that he "thought they were married all the time." On one occasion, as he left the Great Falls Airport, Kathee was waiting in the truck to pick up Fred. The Judge testified that "[Kathee] hollered to me, 'Is my husband on that plane?'"

Janice Mountan, Kathee's sister, testified that "Fritz introduced us as his in-laws. . . . Everyone knew Fritz as being Kathee's husband and Kathee as Fritz's wife." We need not belabor the record. It is abundantly clear that Kathee and Fred cohabited and held themselves out to the community as being husband and wife.

Robert challenges the District Court's findings of fact as erroneous and contradicted by the record. Robert contends that the court omitted from its findings references to testimony which indicated that Fred and Kathee were not married. Specifically, Robert points to the testimony of Donna and Chuck Plant--friends of Fred--who stated that Fred had told them after 1985 that he was not married to Kathee. Robert also notes the absence of Robert Emmons' testimony from the findings. Emmons, an attorney, testified that Fred represented that he was a single man in each of the three wills Emmons drafted for Fred.

It cannot be said that the District Court failed to consider all the testimony merely because it chose not to reference all the testimony it heard in its findings of fact and conclusions of law. The court heard testimony from fifteen witnesses. It found capability of consent to a common-law marriage between Fred and Kathee, mutual assent and agreement to a common-law marriage,

10

cohabitation, and repute in the community as husband and wife.

The court was in the best position to judge the credibility of the witnesses. We will not substitute our judgment for that of the District Court even where there is evidence in the record to support contrary findings. See Trad Industries, Ltd. v. Brogan (1991), 246 Mont. 439, 447, 805 P.2d 54, 59 (citation omitted).

After a careful review of the record, we determine that the District Court's findings of fact were not clearly erroneous. We hold that the District Court correctly interpreted the law when it concluded 1) that the relationship between Kathee Young and Fred Alcorn constituted a valid common-law marriage; and 2) that Kathee is entitled to claim the elections set forth in her Notice of Election Against the Will filed with the District Court on October 1, 1991.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

February 11, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:

Donald J. Hamilton, Esq; Steven T. Potts, Esq.
Jardine, Stephenson, Blewett & Weaver, P.C.
P.O. Box 2269
Great Falls, MT  59403

Donald L. Ostrem, Esq.
Graybill, Ostrem & Crotty
#18-6th St. No., Ste. 200
Great Falls, MT  59401

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy