No. 97-569

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 279

295 Mont. 46

983 P.2d 327

IN THE MATTER OF THE ESTATE OF

MAURICE L. HUNSAKER, Deceased.

ANNE BARNETT, an individual,

Petitioner and Appellant,

vs.

SHORLAND HUNSAKER,

Respondent and Cross-Appellant.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Broadwater,

The Honorable Dorothy McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

James A. McLean, Drysdale, McLean & Nellen, Bozeman, Montana

For Respondent:

Sarah Nash Zimmer, Nash, Guenther & Zimmer, Bozeman, Montana

Submitted on Briefs: January 30, 1998

Decided: November 17, 1998

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

**¶1. Anne Barnett (Anne) appeals from the July 17, 1997 Findings of Fact, Conclusions of Law and Order of the District Court for the First Judicial District, Broadwater County, determining that she was not the common-law wife of decedent Maurice L. Hunsaker (Maurice) and was therefore not an heir to his estate. Shorland Hunsaker (Shorland), one of Maurice's brothers, cross-appeals the District Court's determination that Maurice died intestate. We reverse and remand for further proceedings consistent with this opinion.**

## Factual and Procedural Background

**¶2. Sometime in 1985, Maurice and Anne met at a restaurant where Anne worked as a waitress. At that time, Anne was married to Raymond Price; Maurice had never married. Maurice and Anne became close friends initially, but they did not share an intimate relationship until sometime later. Anne separated from her husband in December 1986 and was divorced on February 30, 1987.**

¶3. After Anne separated from her husband, she moved into a mobile home that Maurice bought for her. Maurice and Anne moved her personal effects into the mobile home the week prior to Christmas 1986. Anne testified that Maurice gave her a gift on every day of that week and that, on Christmas Day, Maurice gave her an engagement ring along with a matching wedding band and asked her to marry him. Anne wore the engagement ring at times, but she did not wear the wedding band. Anne stated that she never wore the wedding band because she did not believe that she had the right to wear it since she and Maurice did not have a formal wedding ceremony.

¶4. Maurice stayed nights with Anne at the mobile home until October 1987, when they moved into Maurice's house near Toston. The title and mortgage on the house were in Maurice's name alone. Maurice and Anne lived together in the house until Maurice's death on September 27, 1996.

¶5. During their relationship, Maurice farmed and ranched at his family's ranch near Toston. Anne worked as an insurance clerk and receptionist at the Family Medical Clinic in Townsend.

¶6. Leonard Lambott (Lambott), a Toston area farmer and grain-elevator operator who knew Maurice and Anne for many years, testified at the bench trial on this matter that a sign in front of the house read, "Hunsakers, Home of the Classics" (referring to Maurice's and Anne's classic car collection). Lambott further testified that the message on the telephone answering machine, recorded by Anne, stated, "this is the Hunsaker residence."

¶7. Anne testified that she and Maurice purchased a large grandfather clock together and displayed the clock in the living room of the house. Maurice had the pendulum of the clock engraved with an "H" for Hunsaker in the center of the pendulum and an "M" for Maurice intertwined with the left side of the "H" and an "A" for Anne intertwined with the right side of the "H." Anne stated that she and Maurice were proud of the clock and showed it to people who came to the house.

¶8. Anne further testified that she and Maurice shopped, traveled and vacationed together, and went out to eat together every Friday night. In addition, Anne stated that they operated a classic car business together, took care of the yard together, and decorated the house for the Christmas season together. Anne testified that they often

cooked dinner for each other.

¶9. Even though they lived together and did many activities together, Anne and Maurice kept separate bank accounts. Because Maurice had poor credit, Anne purchased many personal items for Maurice and he bought many items with Anne's credit. Anne testified that Maurice generally reimbursed her for these purchases.

¶10. Maurice and Anne owned shares of stock in two companies as joint tenants. They also owned a time-share condominium at Island Park, Idaho as joint tenants. Maurice listed Anne as the secondary beneficiary to his sister on his Department of Veterans Affairs life insurance policy. Anne was listed as Maurice's spouse on the Designation of Beneficiary forms for that policy. Although most of one form was filled in by Maurice, Anne testified that she filled in the word "spouse" on that form. Maurice had another life insurance policy that listed Shorland as the sole beneficiary.

¶11. Maurice and Anne filed separate income tax returns each year listing themselves as single instead of married. Anne testified that they filed as single persons because Maurice told her that he was in trouble with the IRS and that he did not want to get her involved with his financial problems. Anne testified that she did not know that she could have filed as married filing jointly. Gary Spitzer (Spitzer), the accountant who prepared Maurice's income tax returns until 1993, testified that Maurice did not indicate to him that Maurice was married.

¶12. Steven Shapiro (Shapiro), a Montana City attorney who represented Maurice in several matters starting in the fall of 1993, testified that he once introduced Anne to a mediator as "Annie Hunsaker, Morrie's wife." Shapiro stated that neither Maurice nor Anne corrected his introduction. Shapiro sent Christmas cards to Maurice and Anne and addressed the cards to "Maurice and Anne Hunsaker." Shapiro testified that he thought that Anne and Maurice were married and was surprised to read in Maurice's obituary that Anne's last name was not Hunsaker.

¶13. Lambott also testified that Anne and Maurice presented themselves as husband and wife and that he therefore perceived them as a married couple. Lambott further testified that Maurice referred to Anne as "my wife." Tom Stonecipher (Stonecipher), a Bozeman attorney who had represented Maurice in the past, however, testified that Lambott once stated that Maurice and Anne were not married

but just "long-term boy and girlfriend."

¶14. Anne testified that she felt that she was married to Maurice during their relationship. She also testified that she thought that Maurice felt married to her.

¶15. Evidence introduced at trial showed that Anne was named as Maurice's spouse on his Department of Veterans Affairs life insurance policy, on his death certificate, and in a magazine article written about Maurice. Anne was also listed as "Anne Hunsaker" on a membership card to a classic car club and on a receipt from a store in Townsend. Additionally, Anne introduced into evidence two wedding invitations that Shorland's daughters sent to the house. Both invitations were addressed to "Mr. and Mrs. Maurice Hunsaker."

¶16. Lee Stokes, a Bozeman attorney, represented a client that was purchasing land from Maurice and two of his brothers and their spouses. He testified that, in trying to make sure that the title to the land was clear, he asked Maurice if he had any premarital agreements with Anne and that Maurice responded that Anne was not his wife and that he did not involve her in business.

¶17. Shorland testified that Maurice called Anne his "sweetheart," but not his wife. Shorland also testified that he was close enough to Maurice that if Maurice had been married, he would have told Shorland. Thomas Hunsaker, one of Maurice's brothers, testified that he did not know if he considered Maurice and Anne to be married.

¶18. Maurice was listed as Anne's "significant other" on two hospital consent forms that Anne signed. One of the consent forms initially listed Maurice as Anne's "husband." However, the word "husband" was crossed out and replaced with "significant other." Betsie Rasmussen, the nurse who filled out the consent forms, testified that she filled them out with information that Anne gave her.

¶19. Shortly before his death, Maurice and Lambott had a conversation about wills. Maurice told Lambott that he wanted to leave his entire estate to Anne. Lambott advised Maurice to talk with an attorney.

¶20. On September 25, 1997, Maurice contacted Stonecipher about preparing a will. Stonecipher testified that Maurice told him that Anne was his "common-law wife"

and that he wanted to leave everything to her. Stonecipher further testified that Maurice said that he did not have a will and that his family would "eat [Anne] alive" if he died without a will leaving his estate to her. Because Stonecipher usually does not prepare wills, he and Maurice decided to speak again the following week to make arrangements for the preparation of a will. However, two days after their initial conversation and before a will could be drafted, Maurice died. He was 63 years old. At the time of his death, Maurice had five surviving brothers and one surviving sister. One brother, Harper Hunsaker, died shortly after Maurice.

¶21. On October 8, 1996, the District Court appointed Anne special administrator of Maurice's estate. Anne petitioned the court on October 25, 1996, to appoint her personal representative of the estate. Anne claimed in her petition that she was Maurice's surviving spouse. On December 3, 1996, Richard Hunsaker, one of Maurice's brothers, petitioned the court to appoint an unrelated third party as personal representative of Maurice's estate or, in the alternative, to appoint "Anne Barnett, the surviving spouse of the Decedent," as personal representative.

¶22. On February 5, 1997, Shorland filed a reply to Anne's petition to be named personal representative. Shorland asserted that Anne was not Maurice's surviving spouse and that Maurice was not married at the time of his death. Shorland also asserted that a document that he filed with the District Court on October 18, 1996, was Maurice's valid, unrevoked will. Shorland requested that the District Court appoint Shorland and his siblings as co-personal representatives of Maurice's estate.

¶23. Both parties agreed in the Pre-Trial Order filed on February 11, 1997, that if it was determined that Anne and Maurice had a common-law marriage then Anne would receive the entire probate estate and that there would be no need to determine the validity of the purported will that Shorland filed with the District Court. Trial was held on February 14, 1997, March 7, 1997, and April 25, 1997, to determine if Anne was Maurice's common-law wife. At the March 7, 1997 session, the District Court appointed Anne and Spitzer to serve as co-personal representatives pending its determination of whether Anne was Maurice's common-law wife.

¶24. On July 17, 1997, the District Court issued its Findings of Fact, Conclusions of Law and Order wherein the court concluded that Anne was not Maurice's common-law wife. The court therefore ruled that Anne was not an heir to Maurice's estate and it denied Anne's petition to be named personal representative of that estate. The

District Court also ruled that Maurice died intestate. From this order, Anne appeals the court's ruling that she was not Maurice's common-law wife and Shorland cross-appeals the court's ruling that Maurice died intestate.

## Standard of Review

¶25. The standard of review of a district court's findings of fact is whether the findings are clearly erroneous. *Daines v. Knight* (1995), 269 Mont. 320, 324, 888 P.2d 904, 906 (citing *Columbia Grain International v. Cereck* (1993), 258 Mont. 414, 417, 852 P.2d 676, 678). *See also* Rule 52(a), M.R.Civ.P.

¶26. This Court adopted a three-part test in *Interstate Production Credit v. DeSaye* (1991), 250 Mont. 320, 820 P.2d 1285, to determine whether a district court's finding of fact is clearly erroneous. A finding of fact is clearly erroneous under the *DeSaye* test if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if, after reviewing the record, this Court is left with a definite and firm conviction that a mistake has been made. *DeSaye*, 250 Mont. at 323, 820 P.2d at 1287. *See also Daines*, 269 Mont. at 325, 888 P.2d at 906.

¶27. The standard of review of a district court's conclusion of law is whether the court's interpretation of the law is correct. *Carbon County v. Union Reserve Coal Co., Inc.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686 (citing *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603-4). *See also Kreger v. Francis* (1995), 271 Mont. 444, 447, 898 P.2d 672, 674.

¶28. We have reviewed the record and conclude that, although substantial evidence exists to support the District Court's findings of fact, the District Court misapprehended the effect of the evidence.

## Discussion

¶29. Because our decision regarding the issue raised in Anne's appeal is dispositive, we address only that issue:

¶30. Did the District Court err in concluding that Anne was not Maurice's common-law wife?

¶31. Montana recognizes common-law marriages. Section 40-1-403, MCA. There is a

disputable presumption that "[a] man and a woman deporting themselves as husband and wife have entered into a lawful contract of marriage." Section 26-1-602 (30), MCA.

¶32. We have long held that the party asserting that a common-law marriage exists has the burden of proving: (1) that the parties were competent to enter into a marriage; (2) that the parties assumed a marital relationship by mutual consent and agreement; and (3) that the parties confirmed their marriage by cohabitation and public repute. *Matter of Estate of Alcorn* (1993), 263 Mont. 353, 356, 868 P.2d 629, 630 (quoting *In re Marriage of Geertz* (1988), 232 Mont. 141, 145, 755 P.2d 34, 37). The party asserting the existence of a common-law marriage must prove all three elements. *Matter of Estate of Vandenhook* (1993), 259 Mont. 201, 204, 855 P.2d 518, 520. Public policy generally favors the finding of a valid marriage. *Geertz*, 232 Mont. at 145, 755 P.2d at 37 (citing § 26-1-602(30), MCA).

¶33. In the case at bar, we first consider whether Maurice and Anne were competent to enter into a marriage. Under § 40-1-401(1)(a), MCA, a party may not enter into a marriage prior to the dissolution of an earlier marriage. Thus, Anne was not competent to enter into a marriage with Maurice, as a matter of law, until her dissolution of marriage from Price was finalized on February 30, 1987. *See Alcorn*, 263 Mont. at 357, 868 P.2d at 631. After Anne's divorce was finalized, the record shows that both she and Maurice were competent to enter into marriage. Thus, Anne has carried her burden as to this element.

¶34. Second, we consider whether Maurice and Anne assumed a marital relationship by mutual consent and agreement. The mutual consent of the parties does not need to be expressed in any particular form. *In re Estate of Slavens* (1973), 162 Mont. 123, 126, 509 P.2d 293, 295 (quoting *Welch v. All Persons* (1929), 85 Mont. 114, 133, 278 P. 110, 115). Mutual consent can be implied from the conduct of the parties. *Miller v. Townsend Lumber Co.* (1968), 152 Mont. 210, 216, 448 P.2d 148, 151. *See also State v. Newman* (1923), 66 Mont. 180, 188, 213 P. 805, 807. This Court has stated that the mutual consent "must always be given with such an intent on the part of each of the parties that marriage cannot be said to steal upon them unawares." *Newman*, 66 Mont. at 188, 213 P. at 807.

¶35. In *Alcorn*, Kathee, who asserted that she was common-law married to Fred, proved that she and Fred mutually consented and agreed to marriage. Fred gave

Kathee a wedding ring that he designed. The ring contained two interlocking horseshoes made with Yogo sapphires, which reflected the couple's shared interest in horses. Kathee testified that Fred designed the ring and gave her a matching bracelet. The couple also used the interlocking horseshoe design at their home by cementing horseshoes into the walkway leading to their house and etching their names below the horseshoes. Kathee also testified that she and Fred agreed that they were husband and wife. The combination of these factors led to our holding in that case that they mutually consented and agreed to a marriage. *Alcorn*, 263 Mont. at 357, 868 P.2d at 631.

¶36. Similar evidence found in the record in the case at bar shows that Maurice and Anne agreed to a marital relationship. Anne wore an engagement ring that Maurice gave her. While we recognize that Anne did not wear the accompanying wedding band, she explained that she did not wear the wedding band only because they did not have a "formal" wedding ceremony.

¶37. Likewise, the grandfather clock engraved with Maurice's and Anne's initials that they prominently displayed in their home has the same effect as the horseshoe design in the walkway in *Alcorn*. Both of these displays are evidence that the parties living together in the home mutually consented and agreed to a marital relationship. Finally, Anne testified that she felt married to Maurice. Anne also testified that she believed that Maurice felt married to her. The engraving on the pendulum of the grandfather clock is evidence of this in that Maurice considered Anne a Hunsaker. Thus, the effect of the evidence in the record is that Anne carried her burden of proving that she and Maurice mutually consented and agreed to a marital relationship.

¶38. Finally, we consider whether Anne proved that she and Maurice confirmed their marriage by cohabitation and public repute. There is no dispute that Maurice and Anne lived together for almost nine years. As to public repute, we consider how the public views the couple. *Miller*, 152 Mont. at 219, 448 P.2d at 152. Relevant to this inquiry is whether the couple held themselves out to the community as husband and wife. *See Alcorn*, 263 Mont. at 358-59, 868 P.2d at 632. A common-law marriage does not exist if the parties have kept their marital relationship secret. *Vandenhook*, 259 Mont. at 205, 855 P.2d at 520 (citing *Miller v. Sutherland* (1957), 131 Mont. 175, 184-85, 309 P.2d 322, 327-28).

¶39. In *Alcorn*, the record was clear that Fred and Kathee lived together for nine years. That, in turn, led us to focus in that case on whether Fred and Kathee established a common-law marriage by public repute. We noted that Kathee never changed her last name to Fred's last name; that she did not list Fred as a beneficiary on her life insurance, health insurance, or retirement forms; that she filed her tax returns as a single person during the term of her relationship with Fred; that Fred stated in his will, which left Kathee one-half of the net value of his ranch and all of his household furniture and goods, that he was single; that two of Fred's friends testified that Fred told them that he was not married to Kathee, and that Fred indicated to an attorney who drafted three wills for him, that he was single.

¶40. Nevertheless, we held in *Alcorn* that Fred and Kathee held themselves out to be husband and wife. *Alcorn*, 263 Mont. at 358, 868 P.2d at 632. In support of this holding, we set out that they spent all of their free time together, that Kathee wore the wedding ring that Fred gave her, that they regularly hosted people at the house, that Kathee spent time with Fred and cared for him during an extensive illness, that Kathee's family referred to Fred as "Uncle Fritz," that several witnesses testified that they considered Fred and Kathee to be married, and that Fred and Kathee held themselves out as a married couple to those witnesses. *Alcorn*, 263 Mont. at 358-59, 868 P.2d at 632.

¶41. In the case at bar, the record shows that Anne and Maurice held themselves out as a married couple and, therefore, had a reputation as such. The sign in the front of their home and the pendulum of the grandfather clock are evidence that Maurice and Anne held themselves out as husband and wife to those who visited their home. The answering machine message is evidence that Maurice and Anne held themselves out as husband and wife to those who called their home. Maurice's brother Richard stated in a petition filed with the District Court that Anne was Maurice's "surviving spouse." One witness testified that Maurice called Anne "my wife." An attorney who represented Maurice thought that Maurice and Anne were married. This attorney also testified that he was surprised to find out in Maurice's obituary that Anne's last name was not Hunsaker. Another attorney who had represented Maurice testified that Maurice called Anne his "common-law wife" shortly before his death. Several documents admitted into evidence referred to Anne as "Anne Hunsaker" or indicated that she was Maurice's wife. The cumulative effect of this evidence is that Maurice and Anne held themselves out to the community as husband and wife and, consequently, had a reputation as a married couple.

¶42. Shorland argues that the fact that Maurice and Anne allowed people to assume that they were married is insufficient to establish a common-law marriage. Although we agree that allowing people to assume a marital relationship is not, by itself, enough to create a common-law marriage, it is evidence that the parties held themselves out to the community as married.

¶43. In addition, Shorland argues that the mutual consent and agreement necessary for a common-law marriage must take place at a set time. However, in *Alcorn*, this Court responded to a similar contention made by one of the parties by stating that this concept is not determinative. We noted that cohabitation and public repute "are continuing factors that extend through the life of the marriage." *Alcorn*, 263 Mont. at 356, 868 P.2d at 630 (quoting *Estate of Murnion* (1984), 212 Mont. 107, 118, 686 P.2d 893, 899). While mutual consent and agreement to enter into a marriage must take place at a set time, the party asserting that a common-law marriage exists does not need to prove the exact date that this occurred. The party asserting the existence of a common-law marriage must, however, prove that the three elements of common-law marriage all existed at one time. The record in the instant case reflects that although Anne could not prove an exact date when all three elements were satisfied, there was a period of time, prior to Maurice's death, when all three elements of common-law marriage existed.

¶44. In sum, although there was substantial evidence to support the District Court's findings of fact, our review of the record leads us to the conclusion that the court misapprehended the effect of the evidence.

¶45. Accordingly, we hold that the District Court erred in ruling that the evidence presented did not establish that Anne was the common-law wife of Maurice.

¶46. Reversed and remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ JIM REGNIER

No

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART

Justice Karla M. Gray, dissenting.

¶47. I respectfully dissent from the Court's opinion. It is my view that the Court has merely substituted its judgment for that of the District Court in weighing conflicting evidence and determining the credibility of the witnesses. This is not our proper role.

¶48. It is clear from the Court's recitation of the factual background of this case that the evidence before the District Court conflicted on the primary questions of whether Anne and Maurice assumed a marital relationship by mutual consent and agreement and whether they had a public reputation of being husband and wife. With regard to the consent and agreement issue, the District Court found that the parties had not mutually consented and agreed to a marital relationship and, indeed, this Court agrees that substantial evidence supports that finding. At that point, our inquiry should end, because we do not substitute our judgment for that of the trial court even where there is evidence of record to support contrary findings. *See Alcorn*, 263 Mont. at 360, 868 P.2d at 633 (citation omitted).

¶49. Nor does *Alcorn* support the Court's determination that Anne and Maurice had assumed a marital relationship by mutual consent and agreement. In *Alcorn*, the party seeking to establish the common-law marriage testified affirmatively that she and the decedent agreed that they were married and that they were husband and wife. *Alcorn*, 263 Mont. at 353, 868 P.2d at 631. On that basis, together with other supporting evidence, the district court found--and we upheld the finding--that the parties mutually consented and agreed to a common-law marriage.

¶50. No such clear statement of mutual consent and agreement to a marital relationship appears in the record now before us. Anne's testimony that she "felt" married to Maurice, and that she "believed" he "felt" married to her, reflects how she and Maurice felt; it does not rise to mutual consent and agreement to a marital relationship. I daresay that many people who live together in an emotionally and physically monogamous relationship "feel" married. That is a far cry, however, from parties actually mutually consenting and agreeing to enter into a marital relationship. Thus, contrary to the Court's statement, there is no evidence of record

in this case similar to that in *Alcorn* which "shows that Maurice and Anne agreed to a marital relationship."

¶51. With regard to the question of public repute as husband and wife, the Court is correct that there is evidence to support a finding that Anne and Maurice held themselves out as husband and wife. There also is evidence that they did not hold themselves out as husband and wife, however, and that evidence supports the District Court's finding. The Court merely picks and chooses from the evidence of record that which supports its own determination--which is contrary to that made by the District Court--that Maurice and Anne held themselves out to the community as husband and wife and had a reputation as a married couple. In doing so, the Court ignores our oft-stated and fundamental rule that "[w]e will not substitute our judgment for that of the District Court even where there is evidence in the record to support contrary findings." *See Alcorn*, 263 Mont. at 360, 868 P.2d at 633 (citation omitted).

¶52. What the Court's opinion does here is to force feed the similarities between this case and *Alcorn* into identical results in the two cases. The problem is that the two cases were decided by the respective trial courts on conflicting evidence; it was the trial court's job in both cases to weigh the evidence before it, determine the credibility of the witnesses and make findings. In *Alcorn*, the district court found that the parties had mutually agreed and consented to a common-law marriage based on substantially stronger evidence than is of record in this case. We upheld that finding and the court's ultimate determination that a valid common-law marriage existed. Here, the District Court found--after weighing conflicting evidence and determining the credibility of the witnesses--that Anne and Maurice had not mutually consented and agreed to a common-law marriage and ultimately determined that a valid common-law marriage had not been proven. It is my view that, on this record, we must conclude that the District Court's finding is not clearly erroneous and hold that the court did not err in determining that Anne did not establish a common-law marriage.

¶53. Finally, I note the Court's conclusion that, notwithstanding the substantial evidence supporting the District Court's findings of fact, "th[at] court misapprehended the effect of the evidence." The Court does not explain what it means by this conclusion or how the District Court's weighing of conflicting evidence constitutes a "misapprehension of the evidence" which allows this Court to substitute

its judgment for that of the trial court on matters of fact. What is clear is that the Court is sympathetic to Anne's plight; I am as well. It also is relatively clear that the members of this Court would have weighed the evidence differently in making findings had they been the trial court presiding over this case; I might have done so, too. It is not our role, however, to decide cases on the basis of which party pulls at our heartstrings. Nor is it our role to override a trial judge's considered weighing of conflicting evidence in order to produce a result more to our liking from a human standpoint. If this is the road the Court intends to follow in applying the "misapprehends the effect of the evidence" prong of our clearly erroneous test for findings of fact, I cannot agree. Such an approach will produce result-oriented decisions which destabilize the state of the law, denigrate the role of Montana's dedicated trial judges, and cheat litigants who prevailed at the trial court level. I dissent.

¶54. I would affirm the District Court's findings and conclusions relating to the nonexistence of a common-law marriage.

¶55. With regard to the issue raised on cross-appeal and not separately addressed by the Court because of its erroneous reversal of the District Court on the common-law marriage issue, I would reverse and remand to the District Court for further proceedings. As discussed above, it is my view that the District Court's finding that Anne was not Maurice's common- law spouse is not clearly erroneous and is entitled to be affirmed. As a result, the cross-appeal question of whether Maurice died intestate, as contended by Anne, or died leaving a valid will, as asserted by Shorland, becomes critical.

¶56. The District Court found that no will had been located and ultimately ordered that the estate was an intestate estate. The record reflects, however, that a purported will signed by Maurice and dated March 30, 1970, was attached to Shorland's reply to Anne's petition for adjudication of intestacy. Thus, the District Court's finding is not supported by substantial evidence.

¶57. Moreover, while it is true that the parties and the trial court agreed that the validity of the purported will would not be determined until after the determination of Anne's spousal status, it is entirely unclear why the District Court--having correctly determined that Anne was not a surviving spouse--went on to make a finding and order of intestacy which did not take into account the purported will

**which was of record and of which the court clearly was aware.**

**¶58. For these reasons, I would reverse and remand for further proceedings on the cross-appeal issue involving whether or not Maurice died intestate.**

/S/ KARLA M. GRAY

**Justice Terry N. Trieweiler joins in the foregoing dissent of Justice Karla M. Gray.**

/S/ TERRY N. TRIEWEILER