FILED

10/07/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0645

DA 24-0645

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 226

IN THE MATTER OF THE ESTATE
OF CAROL A. HUDSON, a/k/a
CAROL ANN KELLER,

     Deceased.

_____

ALAN LEE JOHNSON

     Plaintiff, Counter-Defendant,
     and Appellant,

    v.

DOUGLAS J. NAIL,

     Defendant, Counterclaimant,
     and Appellee.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                In and For the County of Gallatin, Cause Nos. DP-19-10 and DV-412C
                Honorable John C. Brown, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          David B. Cotner, Kyle C. Ryan, Sherine D. Blackford, Cotner Ryan
          Blackford, PLLC, Missoula, Montana

     For Appellee:

          Ben Alke, Crist, Krogh, Alke & Nord, Billings, Montana

                       Submitted on Briefs:  August 13, 2025

                              Decided:  October 7, 2025

Filed:

                    _____
                               Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Decedent Carol Hudson and Appellee Doug Nail were in a relationship for over ten years prior to Carol's death in 2018. Doug claims that he is entitled to his elective spousal share of Carol's estate as her common-law husband. Carol's son, Appellant Alan Johnson (AJ), appeals the Eighteenth Judicial District Court's Findings of Fact, Conclusions of Law, and Order concluding that Carol and Doug had a valid common-law marriage. Applying the governing standards of review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Carol Hudson died unexpectedly in October 2018, leaving nearly the entirety of her estate to her sons, AJ and Jeff Johnson, via her will and a revocable trust. The personal representative of Carol's estate commenced probate proceedings in the Eighteenth Judicial District Court in January 2019. Carol's partner of more than ten years, Doug Nail, claimed that he was entitled to an elective share of the augmented estate because he and Carol were common-law spouses. AJ filed a separate complaint for declaratory relief, asking the District Court to declare that Doug was not Carol's husband. Doug counterclaimed. The District Court consolidated the cases and held a bench trial in June 2024.

¶3 Carol and Doug's relationship began in 2006 or 2007 while they both lived in California. At that time, Carol was single after both of her previous marriages ended in divorce. Doug recently had separated from his second wife, although his divorce was not finalized until May 2010. Each party had two children from a prior relationship: Carol's sons and Doug's children, Ryan and Kaitlyn. The parties maintained separate residences in the early stages of their relationship, but they began living together full-time after their

2

move to Bozeman, Montana, in 2008 or 2009. Doug and Carol enjoyed recreating and socializing together and occasionally hosted their friends and family for dinners and holidays.

¶4 The couple's first house in Bozeman was 118 Falling Star Road. Carol had a passion and talent for interior design, so a few years later she purchased the neighboring lot at 200 Falling Star Road to construct her dream home. Carol financed both homes, and she titled both assets in her name only. Doug performed some of the construction for the new home and assisted Carol with the project's budget. Both Doug and Carol were parties to the construction contract. A local magazine published an article featuring the residence in which the author referred to Doug as "the husband."

¶5 At trial, Doug testified that he and Carol decided not to pursue a traditional marriage because both had been through difficult divorces. The couple learned that Montana recognized common-law marriage through a friend who was in a common-law marriage. Doug explained that although they did not want to have a formal marriage ceremony, they agreed to be spouses. Doug testified that he gave Carol two Cartier love bracelets and a ring in recognition of their commitment to one another. Doug chose not to wear a ring because he liked to recreate and do construction work, and he considered rings to be dangerous. Many of the couple's friends from Bozeman testified that they viewed Doug and Carol as a married couple.

¶6 The District Court found the testimony of Carol's friend and attorney, Shelley Patton, to be "particularly persuasive." Patton practiced family law in California for many years. The two formed a close friendship when Carol lived in California. Patton testified

3

that sometime after Carol's move to Montana but before her California home sold in 2013, Carol confided in Patton that she and Doug were common-law spouses. Patton advised Carol to protect herself by formalizing the marriage. Carol replied that this was unnecessary because she already was married to Doug under Montana law.

¶7 At trial, AJ presented evidence that painted a different picture of Doug and Carol's relationship. AJ, along with other witnesses, testified that Carol was firmly against getting remarried and did not consider Doug to be her husband. AJ did not remember Carol wearing a wedding ring, and Jeff testified that Carol purchased the two Cartier bracelets herself to represent her sons. AJ submitted exhibits showing that Carol designated herself as "single" for tax purposes and identified herself as unmarried on her personal financial statements, loan applications, and medical records. Doug similarly identified himself as unmarried except on a few of his medical forms. AJ believes that Doug did not claim to be Carol's husband until after her death.

¶8 From the record, it is unclear how much Doug contributed to the marriage financially, if anything. Carol received title to a convalescent center in her first divorce that provided $63,000 monthly for Carol to support herself. AJ called witnesses who testified that Carol wanted to leave Doug because he took advantage of her financially. Carol allegedly confided in a few trusted individuals that she wanted to end the relationship but was afraid to do so. For example, Maggie Stein, a Bozeman attorney, testified that around 2015 or 2016, Carol sought Stein's advice about protecting her assets in the event Doug attempted to claim that he and Carol were married.

¶9 After four days of trial, the District Court entered its Findings of Fact, Conclusions of Law, and Order. It determined that Doug and Carol were common-law spouses and that Doug was entitled to file for an elective share of Carol's estate. AJ appeals, arguing that the District Court erred in finding both that Doug and Carol mutually consented to marriage and that they confirmed their marriage by public repute.

**STANDARDS OF REVIEW**

¶10 On appeal from a nonjury trial, "[w]e view the evidence in the light most favorable to the prevailing party." *In re Estate of Zugg*, 2025 MT 78, ¶ 7, 421 Mont. 368, 567 P.3d 297 (internal citation and quotations omitted). Our review is limited to determining whether "substantial credible evidence supports the findings actually made by the district court." *Kulstad v. Maniaci,* 2009 MT 326, ¶ 52, 352 Mont. 513, 220 P.3d 595. We will not disturb a district court's findings of fact unless they are clearly erroneous. *In re Marriage of Hansen*, 2019 MT 284, ¶ 12, 398 Mont. 64, 453 P.3d 1210.

¶11 Findings of fact are clearly erroneous if they are "not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if, after reviewing the record, this Court is left with a definite and firm conviction that a mistake has been made." *In re Estate of Zugg*, ¶ 6 (internal citation and quotations omitted). We do not consider whether the evidence supports alternative findings. *Kulstad*, ¶ 52. We review a district court's conclusions of law for correctness. *In re Marriage of Hansen*, ¶ 12.

## DISCUSSION

¶12 Montana law favors finding a valid marriage. *In re Marriage of Swanner-Renner*, 2009 MT 186, ¶ 16, 351 Mont. 62, 209 P.3d 238. There is a rebuttable presumption that a "man and a woman deporting themselves as husband and wife have entered into a lawful contract of marriage." Section 26-1-602(30), MCA; *In re Estate of Zugg*, ¶ 8. This presumption is "one of the strongest known to the law." *In re Marriage of Swanner-Renner*, ¶ 16.

¶13 Montana recognizes common-law marriage by statute. Section 40-1-403, MCA. Common-law marriage "is an equitable doctrine used to ensure people are treated fairly once a relationship ends." *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶ 24, 325 Mont. 148, 104 P.3d 445. The party seeking to establish the existence of a common-law marriage must prove the following: (1) the parties were competent to marry; (2) the parties mutually consented to a marital relationship; and (3) the parties confirmed their marriage by cohabitation and public repute. *In re J.K.N.A.*, 2019 MT 286, ¶ 25, 398 Mont. 72, 454 P.3d 642.

¶14 The parties do not dispute that Doug and Carol were competent to marry once Doug's divorce was finalized in May 2010. *See* § 40-1-401(1)(a), MCA (prohibiting "a marriage entered into prior to the dissolution of an earlier marriage of one of the parties"). They also do not dispute that Doug and Carol cohabited once they moved to Montana. AJ argues that the trial evidence cannot sustain the remaining requirements of mutual consent and confirmation by public repute.

6

**Mutual Consent**

¶15 The court's finding of mutual consent must be based on the parties' deliberate actions. *In re J.K.N.A.,* ¶ 28. Mutual consent may be implied from the parties' conduct and need not be expressed in any particular form. *In re Estate of Hunsaker*, 1998 MT 279, ¶ 34, 291 Mont. 412, 968 P.2d 281. Mutual consent ensures that marriage does not catch the parties by surprise. *In re Estate of Hunsaker*, ¶ 34 (citing *State v. Newman*, 66 Mont. 180, 188, 213 P. 805, 807 (1923)).

¶16 The District Court concluded that Doug and Carol mutually consented to a marital relationship, finding that "Carol and Doug acted like a married couple, referred to each other as husband and wife, and specifically stated they had a common law marriage." The court was "particularly persua[ded]" by Patton's testimony. It found that the couple shared finances, lived together for ten years, and designated each other as beneficiaries or transferred assets to one another. Although Carol kept her last name and identified herself as single on most documents, the court found that this evidence was of limited weight in light of the trial testimony.

¶17 AJ argues that the court erred by failing to consider the following evidence: both Carol and Doug signed or filled out numerous documents in which they identified themselves as single over the course of their relationship; Carol told her friends and family that she unequivocally did not want to remarry; and she sought advice about ending the relationship. AJ also asserts that the court misapprehended the effect of the testimony and other evidence on which it relied to reach its conclusions.

¶18 We have found mutual consent based on the surviving spouse's testimony that the parties consented to marriage, which was supported by evidence that the couple wore or displayed symbols of their marriage. *In re Estate of Ober*, 2003 MT 7, ¶¶ 12-16, 314 Mont. 20, 62 P.3d 1114 (reasoning that because the parties discussed a marriage ceremony, exchanged rings, and used address labels displaying a common last name, they consented to marriage); *In re Estate of Hunsaker*, ¶¶ 36-37 (holding that mutual consent was satisfied because the couple displayed a grandfather clock engraved with both of their initials, the surviving spouse wore a ring, and she testified that she "felt married"). Spouses are not legally required to use the same last name, file joint income taxes, or designate one another as beneficiaries on certain forms. *In re Estate of Alcorn*, 263 Mont. 353, 358, 868 P.2d 629, 632 (1994); *see also In re Estate of Ober*, ¶¶ 11, 16 (finding mutual consent despite evidence that the parties designated themselves as "single" for tax purposes, maintained separate bank accounts, and used different last names).

¶19 Doug, whose testimony the District Court credited, testified that he and Carol agreed to marry once they moved to Montana, and he gifted Carol two bracelets and a ring as a symbol of this commitment. Doug also produced documents that lent support to a finding of mutual consent. For example, in 2014, Carol filled out a family air ambulance membership application and listed Doug as her "common law husband." Carol also named Doug the primary beneficiary of her life insurance policy and an individual retirement account. Even though Carol decided to file taxes as a single person, describe herself as single on medical and financial documents, and keep her last name, the District Court did not find these facts sufficient to defeat Doug's claim.

¶20　The parties presented starkly conflicting evidence at trial. A trial court has considerable discretion to determine witness credibility and assign weight to their testimony. *In re Estate of Zugg*, ¶ 7. We will not reverse because the factfinder chose to believe one party over another. *Murray v. Whitcraft*, 2012 MT 298, ¶ 26, 367 Mont. 364, 291 P.3d 587. The District Court assigned more weight to Patton's testimony than to that of others, and we do not second-guess this determination on appeal. Although AJ presented evidence to suggest that Carol did not consent to marriage, our role is to "probe the record for evidence to support the fact-finder's determination." *Murray*, ¶ 26. We will not substitute the trial court's judgment with our own even if evidence could support a contrary ruling. *In re Estate of Alcorn*, 263 Mont. at 360, 868 P.2d at 633.

¶21　Affording the appropriate deference due the finder of fact, we are not left with a firm conviction that a mistake has been made, nor do we conclude that the court misapprehended the effect of the evidence. Viewing the evidence in the light most favorable to Doug, we conclude that the District Court did not clearly err when it found that Doug and Carol mutually consented to marriage.

**Public Repute**

¶22　When analyzing public repute, we ask whether the couple held themselves out to the public as spouses. *In re Estate of Hunsaker*, ¶ 38. In this context, the "public" is the people in the couple's community "whose knowledge would establish reputation," instead of strangers or individuals with whom the couple has minimal contact. *In re J.K.N.A.*, ¶ 34 (quoting *Miller v. Sutherland*, 131 Mont. 175, 184-85, 309 P.2d 322, 327-28 (1957)). To establish public repute, the couple's conduct must be "complete and sincere," not partial.

9

*In re J.K.N.A.*, ¶ 34. We will not recognize a common-law marriage if the parties have kept their marriage a secret. *In re Estate of Hunsaker*, ¶ 38.

¶23 The District Court concluded that Doug and Carol confirmed their marriage by public repute because "the community believed they were husband and wife" and they "signed contracts together, built a house together, hosted friends and family together, vacationed together, and generally spent all their time together." AJ argues that the District Court erred when it ignored the "overwhelming weight of evidence establishing that Carol held herself out as unmarried to everyone involved in her life on a personal, financial, and professional level." AJ also argues that the witness testimony presented at trial was partial and inconsistent, which cannot establish public repute.

¶24 As discussed, a spouse's decision to keep their maiden name, file taxes as a single person, and not list their spouse as beneficiary on certain forms will not, by itself, defeat a finding of common-law marriage. *See In re Estate of Ober*, ¶ 16; *In re Estate of Alcorn*, 263 Mont. at 358, 868 P.2d at 632. AJ's argument that the District Court failed to consider this evidence is unpersuasive. Moreover, we do not view financial institutions, medical providers, or government entities as the "public." The proper inquiry is whether Doug and Carol's friends, family, and other people in their community viewed them as married.

¶25 At trial, Carol's ski instructor and friend of ten years testified that she viewed Doug and Carol as a married couple, as did the entire locker room at Bridger Bowl. Several of their mutual friends from Bozeman testified that they thought Doug and Carol were married and were surprised to learn otherwise. The author who wrote the magazine article showcasing the parties' residence referred to Doug as "the husband."

10

"Although . . . allowing people to assume a marital relationship is not, by itself, enough to create a common-law marriage, it is evidence that the parties held themselves out to the community as married." *In re Estate of Hunsaker*, ¶ 42.

¶26 In *Alcorn*, we found the following evidence adequate to support a finding that the couple held themselves out as married: the couple shared finances, spent all of their time together, hosted friends and family at their shared home, and the wife's family referred to the husband as "Uncle." *In re Estate of Alcorn*, 263 Mont. at 358-59, 868 P.2d at 632. Doug presented similar evidence here. Doug and Carol enjoyed years of outdoor activities together, built a house together, and hosted friends and family at their home. Doug's daughter Kaitlyn testified that she referred to Carol as her "stepmom" and included Carol in her wedding recessional. Doug also presented a voicemail Jeff Johnson left him, referring to Jeff's daughters as Doug's "granddaughters" and to Doug as "Grandpa D."

¶27 Viewing the evidence in a light most favorable to Doug, we conclude that there is substantial evidence to support the District Court's conclusion that Doug and Carol confirmed their marriage by public repute. The District Court's finding on this issue was not clearly erroneous.

**CONCLUSION**

¶28 Finally, our review of the record also must be informed by the law favoring marriage and the disputable presumption contained in § 26-1-602(30), MCA. *See In re Marriage of Swanner-Renner*, ¶ 16. "Because an assessment of testimony is best made upon observation of the witness's demeanor and consideration of other intangibles that are only evident during live testimony, the fact-finder is uniquely in the best position to judge the

11

credibility of witnesses." *State v. Barrus*, 2025 MT 183, ¶ 33, 423 Mont. 391, 573 P.3d 1188 (internal citation omitted). Considering the governing standards of law and the trial record as a whole, we conclude that the District Court did not clearly err when it found that Doug and Carol mutually consented to marriage and confirmed their marital relationship by public repute.

¶29 We affirm the District Court's ruling that Doug and Carol were common-law spouses at the time of Carol's death.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON